# GWALTNEY OF SMITHFIELD, LTD. *v.* CHESAPEAKE BAY FOUNDATION, INC., ET AL.

No. 86–473. Argued October 5, 1987—Decided December 1, 1987

50

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, and BLACKMUN, JJ., joined, and in Parts I and II of which STEVENS, O'CONNOR, and SCALIA, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 67.

*E. Barrett Prettyman, Jr.*, argued the cause for petitioner. With him on the briefs were *Richard J. M. Poulson, Patrick M. Raher, Catherine James LaCroix*, and *John G. Roberts, Jr.*

*Louis F. Claiborne* argued the cause for respondents. With him on the brief were *Jeter M. Watson* and *James Thornton.**

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States et al. by *Theodore L. Garrett, Katherine L. Rhyne, Robin S. Conrad, James K. Jackson*, and *Richard Wasserstrom;* for the Connecticut Business and Industry Association by *Wayne S. Henderson;* for the Consolidated Rail Corporation et al. by *McNeill Watkins II, James E. Baine, Timothy N. Atherton, Nathan M. Edelstein, Jose A. Berlanga*, and *Grant Van Horne;* and for Rollins Environmental Services (NJ) Inc., by *William H. Lewis, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Acting Assistant Attorney General Hookano, Deputy Solicitor General Wallace, Jeffrey P. Minear*, and *David C. Shilton;* for the State of Alabama et al. by *John K. Van de Kamp*, Attorney General of California, *Roderick E. Walston* and *Allene C. Zanger*, Deputy Attorneys General, *Don Siegelman*, Attorney General of Alabama, *Joseph I. Lieberman*, Attorney General of Connecticut, *Robert E. Walsh*, Assistant Attorney General, *Warren Price III*, Attorney General of Hawaii, *James E. Tierney*, Attorney General of Maine, *Philip Ahrens*, Deputy Attorney General, *Frank J. Kelley*, Attorney General of Michigan, *Louis J. Caruso*, Solicitor General, *William L. Webster*, Attorney General of Missouri, *Louis W. Rose*, Special Assistant Attorney General of New Mexico, *T. Travis Medlock*, Attorney General of South Carolina, *W. J. Michael Cody*, Attorney General of Tennessee, *Jeffrey L. Amestoy*, Attorney

JUSTICE MARSHALL delivered the opinion of the Court.

In this case, we must decide whether § 505(a) of the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U. S. C. § 1365(a), confers federal jurisdiction over citizen suits for wholly past violations.

## I

The Clean Water Act (Act), 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1982 ed. and Supp. III), was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). In order to achieve these goals, § 301(a) of the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act. 33 U. S. C. § 1311(a).

One of these specified sections is § 402, which establishes the National Pollutant Discharge Elimination System (NPDES). 33 U. S. C. § 1342. Pursuant to § 402(a), the Administrator of the Environmental Protection Agency (EPA) may issue permits authorizing the discharge of pollutants in accordance with specified conditions. § 1342(a). Pursuant to § 402(b), each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the Administrator. § 1342(b). The Act calls for the Administrator to suspend the issuance of federal permits as to waters subject to an approved state program. § 1342(c)(1).

The holder of a federal NPDES permit is subject to enforcement action by the Administrator for failure to comply

General of Vermont, *Mary Sue Terry*, Attorney General of Virginia, and *Kenneth Eikenberry*, Attorney General of Washington; for Friends of the Earth et al. by *Bruce J. Terris;* and for the National Wildlife Federation by *Mark Van Putten* and *Norman L. Dean, Jr.*

Briefs of *amici curiae* were filed for Bethlehem Steel Corporation et al. by *Benjamin Rosenberg;* and for Mid-Atlantic Legal Foundation Inc., et al. by *Richard B. McGlynn.*

with the conditions of the permit. The Administrator's enforcement arsenal includes administrative, civil, and criminal sanctions. § 1319. The holder of a state NPDES permit is subject to both federal and state enforcement action for failure to comply. §§ 1319, 1342(b)(7). In the absence of federal or state enforcement, private citizens may commence civil actions against any person "alleged to be in violation of" the conditions of either a federal or state NPDES permit. § 1365(a)(1). If the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury. § 1365(a).

The Commonwealth of Virginia established a federally approved state NPDES program administered by the Virginia State Water Control Board (Board). Va. Code § 62.1–44.2 *et seq.* (1950). In 1974, the Board issued a NPDES permit to ITT-Gwaltney authorizing the discharge of seven pollutants from the company's meatpacking plant on the Pagan River in Smithfield, Virginia. The permit, which was reissued in 1979 and modified in 1980, established effluent limitations, monitoring requirements, and other conditions of discharge. In 1981, petitioner Gwaltney of Smithfield acquired the assets of ITT-Gwaltney and assumed obligations under the permit.

Between 1981 and 1984, petitioner repeatedly violated the conditions of the permit by exceeding effluent limitations on five of the seven pollutants covered. These violations are chronicled in the Discharge Monitoring Reports that the permit required petitioner to maintain. See 9 Record, Exh. 10. The most substantial of the violations concerned the pollutants fecal coliform, chlorine, and total Kjeldahl nitrogen (TKN). Between October 27, 1981, and August 30, 1984, petitioner violated its TKN limitation 87 times, its chlorine limitation 34 times, and its fecal coliform limitation 31 times. 9 Record, Stipulation, p. 3. Petitioner installed new equipment to improve its chlorination system in March 1982, and its last reported chlorine violation occurred in October 1982.

*Id.*, at 7–8.   The new chlorination system also helped to control the discharge of fecal coliform, and the last recorded fecal coliform violation occurred in February 1984.   9 Record, Exh. 10–A.   Petitioner installed an upgraded wastewater treatment system in October 1983, and its last reported TKN violation occurred on May 15, 1984.   9 Record, Stipulation, p. 10.

Respondents Chesapeake Bay Foundation and Natural Resources Defense Council, two nonprofit corporations dedicated to the protection of natural resources, sent notice in February 1984 to Gwaltney, the Administrator of EPA, and the Virginia State Water Control Board, indicating respondents' intention to commence a citizen suit under the Act based on petitioner's violations of its permit conditions.   Respondents proceeded to file this suit in June 1984, alleging that petitioner "has violated . . . [and] will continue to violate its NPDES permit."   1 Record, Doc. No. 1, p. 5.   Respondents requested that the District Court provide declaratory and injunctive relief, impose civil penalties, and award attorney's fees and costs.   The District Court granted partial summary judgment for respondents in August 1984, declaring Gwaltney "to have violated and to be in violation" of the Act.   No. 84–0366–R (ED Va. Aug. 30, 1984).   The District Court then held a trial to determine the appropriate remedy.

Before the District Court reached a decision, Gwaltney moved in May 1985 for dismissal of the action for want of subject-matter jurisdiction under the Act.   Gwaltney argued that the language of § 505(a), which permits private citizens to bring suit against any person "alleged to be in violation" of the Act,[1] requires that a defendant be violating the Act at

---

[1] In its entirety, § 505(a), as codified, 33 U. S. C. § 1365(a), provides:

"Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

"(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by

the time of suit. Gwaltney urged the District Court to adopt the analysis of the Fifth Circuit in *Hamker* v. *Diamond Shamrock Chemical Co.*, 756 F. 2d 392 (1985), which held that "a complaint brought under [§ 505] must allege a violation occurring at the time the complaint is filed." *Id.*, at 395. Gwaltney contended that because its last recorded violation occurred several weeks before respondents filed their complaint, the District Court lacked subject-matter jurisdiction over respondents' action. See 4 Record, Doc. No. 44.

The District Court rejected Gwaltney's argument, concluding that § 505 authorizes citizens to bring enforcement actions on the basis of wholly past violations. The District Court found that "[t]he words 'to be in violation' may reasonably be read as comprehending unlawful conduct that occurred solely prior to the filing of the lawsuit as well as unlawful conduct that continues into the present." 611 F. Supp. 1542, 1547 (ED Va. 1985). In the District Court's view, this construction of the statutory language was supported by the legislative history and the underlying policy goals of the Act. *Id.*, at 1550. The District Court held in the alternative that respondents satisfied the jurisdictional requirements of § 505 because their complaint alleged in good faith that Gwaltney was continuing to violate its permit at the time the suit was filed. *Id.*, at 1549, n. 8.

the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

"(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

"The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title."

The Court of Appeals affirmed, expressly rejecting the Fifth Circuit's approach in *Hamker* and holding that § 505 "can be read to comprehend unlawful conduct that occurred only prior to the filing of a lawsuit as well as unlawful conduct that continues into the present." 791 F. 2d 304, 309 (CA4 1986). The Court of Appeals concluded that its reading of § 505 was consistent with the Act's structure, legislative history, and purpose. Although it observed that "[a] very sound argument can be made that [respondents'] allegations of continuing violations were made in good faith," the Court of Appeals declined to rule on the District Court's alternative holding, finding it unnecessary to the disposition of the case. *Id.*, at 308, n. 9.

Subsequent to the issuance of the Fourth Circuit's opinion, the First Circuit also had occasion to construe § 505. It took a position different from that of either the Fourth or the Fifth Circuit, holding that jurisdiction lies under § 505 when "the citizen-plaintiff fairly alleges a continuing likelihood that the defendant, if not enjoined, will again proceed to violate the Act." *Pawtuxet Cove Marina, Inc.* v. *Ciba-Geigy Corp.*, 807 F. 2d 1089, 1094 (1986). The First Circuit's approach precludes suit based on wholly past violations, but permits suit when there is a pattern of intermittent violations, even if there is no violation at the moment suit is filed. We granted certiorari to resolve this three-way conflict in the Circuits. 479 U. S. 1029 (1987). We now vacate the Fourth Circuit's opinion and remand the case.

## II

### A

It is well settled that "the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). The Court of Appeals concluded that the "to be in violation" language of § 505 is ambiguous, whereas petitioner asserts that it plainly precludes the construction

adopted below. We must agree with the Court of Appeals that § 505 is not a provision in which Congress' limpid prose puts an end to all dispute. But to acknowledge ambiguity is not to conclude that all interpretations are equally plausible. The most natural reading of "to be in violation" is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future. Congress could have phrased its requirement in language that looked to the past ("to have violated"), but it did not choose this readily available option.

Respondents urge that the choice of the phrase "to be in violation," rather than phrasing more clearly directed to the past, is a "careless accident," the result of a "debatable lapse of syntactical precision." Brief for Respondents 8. But the prospective orientation of that phrase could not have escaped Congress' attention. Congress used identical language in the citizen suit provisions of several other environmental statutes that authorize only prospective relief. See, e. g., Clean Air Act, 42 U. S. C. § 7604; Resource Conservation and Recovery Act of 1976, 42 U. S. C. § 6972 (1982 ed. and Supp. III); Toxic Substances Control Act, 15 U. S. C. § 2619 (1982 ed. and Supp. IV). Moreover, Congress has demonstrated in yet other statutory provisions that it knows how to avoid this prospective implication by using language that explicitly targets wholly past violations.[2]

---

[2] For example, the Solid Waste Disposal Act was amended in 1984 to authorize citizen suits against any "past or present" generator, transporter, owner, or operator of a treatment, storage, or disposal facility "who has contributed or who is contributing" to the "past or present" handling, storage, treatment, transportation, or disposal of certain hazardous wastes. 42 U. S. C. § 6972(a)(1)(B) (1982 ed., Supp. III). Prior to 1984, the Solid Waste Disposal Act contained language identical to that of § 505(a) of the Clean Water Act, authorizing citizen suits against any person "alleged to be in violation" of waste disposal permits or standards. 42 U. S. C. § 6972(a)(1). Even more on point, the most recent Clean Water Act amendments permit EPA to assess administrative penalties without

Respondents seek to counter this reasoning by observing that Congress also used the phrase "is in violation" in § 309(a) of the Act, which authorizes the Administrator of EPA to issue compliance orders. 33 U. S. C. § 1319(a). That language is incorporated by reference in § 309(b), which authorizes the Administrator to bring civil enforcement actions. § 1319(b). Because it is little questioned that the Administrator may bring enforcement actions to recover civil penalties for wholly past violations, respondents contend, the parallel language of § 309(a) and § 505(a) must mean that citizens, too, may maintain such actions.

Although this argument has some initial plausibility, it cannot withstand close scrutiny and comparison of the two statutory provisions. The Administrator's ability to seek civil penalties is not discussed in either § 309(a) or § 309(b); civil penalties are not mentioned until § 309(d), which does not contain the "is in violation" language. 33 U. S. C. § 1319(d). This Court recently has recognized that § 309(d) constitutes a separate grant of enforcement authority:

> "Section 1319 [§ 309] does not intertwine equitable relief with the imposition of civil penalties. Instead each kind of relief is separably authorized in a separate and distinct statutory provision. Subsection (b), providing injunctive relief, is independent of subsection (d), which provides only for civil penalties." *Tull* v. *United States*, 481 U. S. 412, 425 (1987).

In contrast, § 505 of the Act does not authorize civil penalties separately from injunctive relief; rather, the two forms of relief are referred to in the same subsection, even in the same sentence. 33 U. S. C. § 1365(a). The citizen suit provision suggests a connection between injunctive relief and civil penalties that is noticeably absent from the provision authorizing agency enforcement. A comparison of § 309 and § 505 thus

---

judicial process on any person who "has violated" the provisions of the Act. Water Quality Act of 1987, § 314, Pub. L. 100–4, 101 Stat. 46.

supports rather than refutes our conclusion that citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation.

## B

Our reading of the "to be in violation" language of § 505(a) is bolstered by the language and structure of the rest of the citizen suit provisions in § 505 of the Act. These provisions together make plain that the interest of the citizen-plaintiff is primarily forward-looking.

One of the most striking indicia of the prospective orientation of the citizen suit is the pervasive use of the present tense throughout § 505. A citizen suit may be brought only for violation of a permit limitation "which is in effect" under the Act. 33 U. S. C. § 1365(f). Citizen-plaintiffs must give notice to the alleged violator, the Administrator of EPA, and the State in which the alleged violation "occurs." § 1365(b)(1)(A). A Governor of a State may sue as a citizen when the Administrator fails to enforce an effluent limitation "the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State." § 1365(h). The most telling use of the present tense is in the definition of "citizen" as "a person . . . having an interest which is or may be adversely affected" by the defendant's violations of the Act. § 1365(g). This definition makes plain what the undeviating use of the present tense strongly suggests: the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past.

Any other conclusion would render incomprehensible § 505's notice provision, which requires citizens to give 60 days' notice of their intent to sue to the alleged violator as well as to the Administrator and the State. § 1365(b)(1)(A). If the Administrator or the State commences enforcement action within that 60-day period, the citizen suit is barred, presumably because governmental action has rendered it un-

necessary.[3]  § 1365(b)(1)(B).   It follows logically that the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.   If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous.   Indeed, respondents, in propounding their interpretation of the Act, can think of no reason for Congress to require such notice other than that "it seemed right" to inform an alleged violator that it was about to be sued.   Brief for Respondents 14.

Adopting respondents' interpretation of § 505's jurisdictional grant would create a second and even more disturbing anomaly.   The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action.   The legislative history of the Act reinforces this view of the role of the citizen suit.   The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility."   S. Rep. No. 92–414, p. 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973) (hereinafter Leg. Hist.).   Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit.   This danger is best illustrated by an example.   Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a).   Suppose further that the

---

[3] The notice provisions specifically provide that citizen suits are barred only if the Administrator or State has commenced an action *"to require compliance."*   33 U. S. C. § 1365(b)(1)(B) (emphasis added).   This language supports our conclusion that the precluded citizen suit is also an action for compliance, rather than an action solely for civil penalties for past, nonrecurring violations.

Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

## C

The legislative history of the Act provides additional support for our reading of § 505. Members of Congress frequently characterized the citizen suit provisions as "abatement" provisions or as injunctive measures. See, e. g., Water Pollution Control Legislation, Hearings before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 92d Cong., 1st Sess., pt. 1, p. 114 (1971) (staff analysis of S. 523) ("Any person may sue a polluter to abate a violation . . ."); id., pt. 2, at 707 (Sen. Eagleton) ("Citizen suits . . . are brought for the purpose of abating pollution"); H. R. Rep. No. 92–911, p. 407 (1972), 1 Leg. Hist. 876 (additional views of Reps. Abzug and Rangel) ("[C]itizens may institute suits against polluters for the purpose of halting that pollution"); 118 Cong. Rec. 33693 (1972), 1 Leg. Hist. 163 (Sen. Muskie) ("Citizen suits can be brought to enforce against both continuous and intermittent violations"); id., at 33717, 1 Leg. Hist. 221 (Sen. Bayh) ("These sorts of citizen suits — in which a citizen can obtain an injunction but cannot obtain money damages for himself—are a very useful additional tool in enforcing environmental protection laws").

Moreover, both the Senate and House Reports explicitly connected § 505 to the citizen suit provisions authorized by the Clean Air Act, which are wholly injunctive in nature. See S. Rep. No. 92–414, *supra*, at 79, 2 Leg. Hist. 1497 (Citizen participation under the Clean Water Act is "modeled on the provision enacted in the Clean Air Amendments of 1970"); H. R. Rep. No. 92–911, *supra*, at 133, 1 Leg. Hist. 820 ("Section 505 closely follows the concepts utilized in section 304 of the Clean Air Act"). Congress' acknowledgment of this connection suggests that the identity of the "alleged to be in violation" language of the citizen suit provisions of the two Acts is not accidental; rather, the two provisions share the common central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance. This understanding of the "alleged to be in violation" language as a statutory term of art rather than a mere stylistic infelicity is reinforced by the consistent adherence in the Senate and House Reports to the precise statutory formulation. See, *e. g.*, S. Conf. Rep. No. 92–1236, p. 145 (1972), 1 Leg. Hist. 328; H. R. Rep. No. 92–911, *supra*, at 133, 1 Leg. Hist. 820; S. Rep. No. 92–414, *supra*, at 79, 2 Leg. Hist. 1497.

Respondents make much of the fact that Senator Muskie, one of the principal authors and sponsors of the bill, deviated from this formulation at one point, expressing the view that "a citizen has a right under section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, *or to have been*, in violation." 118 Cong. Rec. 33700 (1972), 1 Leg. Hist. 179 (emphasis added). When viewed in context, however, Senator Muskie's statement does not support respondents' contention that § 505 authorizes citizen suits for wholly past violations. The full context of the Senator's remarks is as follows:

"This 60-day [notice] provision was not intended, however, to cut off the right of action a citizen may have [with respect] to violations that took place 60 days ear-

lier but which may not have been continuous. As in the original Senate bill, a citizen has a right under section 505 to bring an action for an approprate remedy in the case of any person who is alleged to be, or to have been, in violation, whether the violation be a continuous one, or an occasional or sporadic one." *Ibid.*

The surrounding text strongly suggests that Senator Muskie used the past tense in order to make clear that an intermittent polluter—one who violates permit limitations one month out of every three—is just as much "in violation" of the Act as a continuous violator. His reference to "occasional or sporadic" violations cannot fairly be read to include "wholly past" violations, as respondents contend. Our understanding of Senator Muskie's written remarks is supported by the Senator's oral summary of his written views for his colleagues. In summarizing, Senator Muskie stated merely that "[c]itizen suits can be brought to enforce against both continuous and intermittent violations." *Id.*, at 33693, 1 Leg. Hist. 163. Noticeably lacking here, too, is any reference to wholly past violations. Senator Muskie's remarks cannot bear the weight that respondents place on them.[4]

---

[4] Respondents also seek to rely on the legislative history of the 1987 amendments to the Act, which, *inter alia*, gave the Administrator authority to assess civil penalties for past violations without judicial enforcement proceedings. Water Quality Act of 1987, § 314, Pub. L. 100–4, 101 Stat. 46. Respondents point to provisions in the 1987 Act and statements in its legislative history to the effect that an administrative penalty action for violation of one effluent limitation does not bar a citizen suit for a past violation of another effluent limitation, even if the two violations resulted from the same discharge. Brief for Respondents 17–18, and n. 11. Respondents contend that this evidence demonstrates that the 99th Congress viewed the Act as permitting citizen suits for wholly past violations. The conclusions of the 99th Congress, however, are hardly probative of the intent of the 92d Congress. See *Rainwater* v. *United States*, 356 U. S. 590, 593 (1958). Moreover, the provisions and legislative history of the 1987 Act support arguments that cut against respondents as well. The fact that Congress consciously chose the past tense to describe the Administrator's new authority to assess civil penalties suggests that Congress

### III

Our conclusion that § 505 does not permit citizen suits for wholly past violations does not necessarily dispose of this lawsuit, as both lower courts recognized. The District Court found persuasive the fact that "[respondents'] allegation in the complaint, that Gwaltney was continuing to violate its NPDES permit when plaintiffs filed suit[,] appears to have been made fully in good faith." 611 F. Supp., at 1549, n. 8. On this basis, the District Court explicitly held, albeit in a footnote, that "even if Gwaltney were correct that a district court has no jurisdiction over citizen suits based entirely on unlawful conduct that occurred entirely in the past, the Court would still have jurisdiction here." *Ibid.* The Court of Appeals acknowledged, also in a footnote, that "[a] very sound argument can be made that [respondents'] allegations of continuing violations were made in good faith," 791 F. 2d, at 308, n. 9, but expressly declined to rule on this alternative holding. Because we agree that § 505 confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation, we remand the case to the Court of Appeals for further consideration.

Petitioner argues that citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505. Brief for Petitioner 37–43. We cannot agree. The statute does not require that a defendant "be in violation" of the Act at the commencement of suit; rather, the statute requires that a defendant be *"alleged* to be in violation." Petitioner's construction of the Act reads the word "alleged" out of § 505. As petitioner itself is quick

---

knows how to target past violations when it wants to do so. See n. 2, *supra.* The legislative history demonstrates that the Senate and House bills were in conflict on whether to adopt the present or past tense, compare H. R. Rep. No. 99–189, p. 89 (1985), with S. Rep. No. 99–50, pp. 26, 100 (1985), and the Act reflects that Congress chose to adopt the past tense from the Senate bill.

to note in other contexts, there is no reason to believe that Congress' drafting of § 505 was sloppy or haphazard.   We agree with the Solicitor General that "Congress's use of the phrase 'alleged to be in violation' reflects a conscious sensitivity to the practical difficulties of detecting and proving chronic episodic violations of environmental standards." Brief for United States as *Amicus Curiae* 18.   Our acknowledgment that Congress intended a good-faith allegation to suffice for jurisdictional purposes, however, does not give litigants license to flood the courts with suits premised on baseless allegations.   Rule 11 of the Federal Rules of Civil Procedure, which requires pleadings to be based on a good-faith belief, formed after reasonable inquiry, that they are "well grounded in fact," adequately protects defendants from frivolous allegations.

Petitioner contends that failure to require proof of allegations under § 505 would permit plaintiffs whose allegations of ongoing violation are reasonable but untrue to maintain suit in federal court even though they lack constitutional standing.   Petitioner reasons that if a defendant is in complete compliance with the Act at the time of suit, plaintiffs have suffered no injury remediable by the citizen suit provisions of the Act.   Petitioner, however, fails to recognize that our standing cases uniformly recognize that allegations of injury are sufficient to invoke the jurisdiction of a court.   In *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975), for example, we made clear that a suit will not be dismissed for lack of standing if there are sufficient "allegations of fact"—not proof—in the complaint or supporting affidavits.[5]   This is not to say,

_____

[5] See also *Warth* v. *Seldin*, 422 U. S., at 501 ("Art. III's requirement remains: the plaintiff still must *allege* a distinct and palpable injury to himself . . .") (emphasis added); *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617 (1973) ("[W]e have steadfastly adhered to the requirement that . . . federal plaintiffs must *allege* some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction") (footnotes omitted; emphasis added); *Baker* v. *Carr*, 369 U. S. 186, 204 (1962) ("Have the [plaintiffs] *alleged* such a personal stake in the outcome

however, that such allegations may not be challenged. In *United States* v. *SCRAP*, 412 U. S. 669, 689 (1973), we noted that if the plaintiffs' "allegations [of standing] were in fact untrue, then the [defendants] should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact." If the defendant fails to make such a showing after the plaintiff offers evidence to support the allegation, the case proceeds to trial on the merits, where the plaintiff must prove the allegations in order to prevail. But the Constitution does not require that the plaintiff offer this proof as a threshold matter in order to invoke the District Court's jurisdiction.

Petitioner also worries that our construction of § 505 would permit citizen-plaintiffs, if their allegations of ongoing noncompliance become false at some later point in the litigation because the defendant begins to comply with the Act, to continue nonetheless to press their suit to conclusion. According to petitioner, such a result would contravene both the prospective purpose of the citizen suit provisions and the "case or controversy" requirement of Article III. Longstanding principles of mootness, however, prevent the maintenance of suit when "'there is no reasonable expectation that the wrong will be repeated.'" *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953) (quoting *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 448 (CA2 1945)). In seeking to have a case dismissed as moot, however, the defendant's burden "is a heavy one." 345 U. S., at 633. The defendant must demonstrate that it is *"absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968) (emphasis added). Mootness doctrine thus protects defendants from the mainte-

---

of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?") (emphasis added).

nance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable "protestations of repentance and reform." *United States* v. *Oregon State Medical Society*, 343 U. S. 326, 333 (1952).[6]

Because the court below erroneously concluded that respondents could maintain an action based on wholly past violations of the Act, it declined to decide whether respondents' complaint contained a good-faith allegation of ongoing violation by petitioner. We therefore remand the case for consideration of this question. The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion. I cannot join Part III because I believe it misreads the statute to create a peculiar new form of subject-matter jurisdiction.

I

The Court concludes that subject-matter jurisdiction exists under § 505 if there is a good-faith allegation that the defendant is "in violation." Thereafter, according to the Court's in-

---

[6] Under the Act, plaintiffs are also protected from the suddenly repentant defendant by the authority of the district courts to award litigation costs "whenever the court determines such award is appropriate." 33 U. S. C. § 1365(d). The legislative history of this provision states explicitly that the award of costs "should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499.

terpretation, the plaintiff can never be called on to prove that jurisdictional allegation. *Ante*, at 65. This creates a regime that is not only extraordinary, but to my knowledge unique. I can think of no other context in which, in order to carry a lawsuit to judgment, allegations are necessary but proof of those allegations (if they are contested) is not. The Court thinks it necessary to find that Congress produced this jurisprudential anomaly because any other conclusion, in its view, would read the word "alleged" out of § 505. It seems to me that, quite to the contrary, it is the Court's interpretation that ignores the words of the statute.

Section 505(a) states that "any citizen may *commence* a civil action on his own behalf . . . against any person . . . who is alleged to be in violation . . ." (emphasis added). There is of course nothing unusual in the proposition that only an allegation is required to *commence* a lawsuit. Proof is never required, and could not practicably be required, at that stage. From this clear and unexceptionable language of the statute, one of two further inferences can be made: (1) The inference the Court chooses, that the requirement for commencing a suit is the same as the requirement for maintaining it, or (2) the inference that, in order to maintain a suit the allegations that are required to commence it must, if contested, be proved. It seems to me that to favor the first inference over the second is to prefer the eccentric to the routine. It is well ingrained in the law that subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged. See, *e. g.*, *Land* v. *Dollar*, 330 U. S. 731, 735, n. 4 (1947); *Thomson* v. *Gaskill*, 315 U. S. 442, 446 (1942); *KVOS, Inc.* v. *Associated Press*, 299 U. S. 269, 278 (1936); *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189 (1936). Had Congress intended us to eliminate the second form of challenge, and to create an extraordinary regime in which the jurisdictional fact consists of a good-faith belief, it seems to me it would have delivered those

instructions in more clear fashion than merely specifying how a lawsuit can be commenced.

In my view, therefore, the issue to be resolved by the Court of Appeals on remand of this suit is not whether the allegation of a continuing violation on the day suit was brought was made in good faith after reasonable inquiry, but whether petitioner was in fact "in violation" on the date suit was brought. The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act—the opposite of a state of compliance. A good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated. When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation. It does not suffice to defeat subject-matter jurisdiction that the success of the attempted remedies becomes clear months or even weeks after the suit is filed. Subject-matter jurisdiction "depends on the state of things at the time of the action brought"; if it existed when the suit was brought, "subsequent events" cannot "ous[t]" the court of jurisdiction. *Mollan* v. *Torrance*, 9 Wheat. 537, 539 (1824); see, *e. g.*, *Smith* v. *Sperling*, 354 U. S. 91, 93, n. 1 (1957); *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.*, 303 U. S. 283, 289–290 (1938). It is this requirement of clarity of cure for a past violation, contained in the phrase "to be in violation," rather than a novel theory of subject-matter jurisdiction by good-faith allegation, that meets the Court's concern for "'the practical difficulties of detecting and proving chronic episodic violations,'" *ante*, at 65, quoting Brief for United States as *Amicus Curiae* 18.

Thus, I think the question on remand should be whether petitioner had taken remedial steps that had clearly achieved

the effect of curing all past violations by the time suit was brought. I cannot claim that the Court's standard and mine would differ greatly in their practical application. They would, for example, almost certainly produce identical results in this lawsuit. See 611 F. Supp. 1542, 1549, n. 8 (ED Va. 1985) (District Court, in stating that allegation of continuing violation was in good faith, relied entirely on post-complaint uncertainty as to whether cause of TKN violation was cured). This practical insignificance, however, makes all the more puzzling the Court's willingness to impute to Congress creation of an unprecedented scheme where that which must be alleged need not be proved.

## II

Even if the Court were correct that no evidence of a state of noncompliance has to be produced to survive a motion for dismissal on grounds of subject-matter jurisdiction, such evidence would still be required in order to establish the plaintiff's standing. While Gwaltney did not seek certiorari (or even appeal to the Court of Appeals) on the denial of its motion to dismiss for lack of standing, it did raise the standing issue before us here, see Reply Brief for Petitioner 17–18, and we in any event have an independent obligation to inquire into standing where it is doubtful, see *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 541 (1986). If it is undisputed that the defendant was in a state of compliance when this suit was filed, the plaintiffs would have been suffering no remediable injury in fact that could support suit. The constitutional requirement for such injury is reflected in the statute itself, which defines "citizen" as one who has "an interest which is or may be adversely affected." 33 U. S. C. § 1365(g). See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 16 (1981).

Accordingly, even on the Court's theory of this case it seems to me that the remand should require the lower court to consider not just good-faith allegation of a state of violation

but its actual existence.   To be sure, nothing in the Court's opinion *precludes* such consideration of standing, but under sound practice the remand should *require* it.   See, *e. g.*, *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 378 (1982); *Combs* v. *United States*, 408 U. S. 224, 227–228 (1972) *(per curiam)*.   Of course that disposition would call attention to the fact that we have interpreted the statute to confer subject-matter jurisdiction over a class of cases in which, by the terms of the statute itself, there cannot possibly be standing to sue.