**Wayne HIEBENTHAL and David Hiebenthal, Plaintiffs,**

v.

**MEDURI FARMS, Defendant.**

No. CIV.02–664–AS.

United States District Court, D. Oregon.

Nov. 27, 2002.

J. Douglas Quirk, Oregon Clean Water Action Project, Eugene, OR, for Plaintiffs.

Beverly C. Pearman, Stoel Rives LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

On September 23, 2002, Magistrate Judge Ashmanskas filed his Findings and Recommendation recommending defendant's Motion to Dismiss (which was converted subsequently into a motion for summary judgment) be granted. Plaintiffs have filed timely objections. The matter is now before the court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a Magistrate Judge's Findings and Recommendation on a dispositive motion, the district court reviews the Magistrate Judge's report *de novo*. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981). For the reasons stated below, the court adopts the Findings and Recommendation (doc. # 4) on alternate grounds. Defendant's Motion to Dismiss (doc. # 4) is GRANTED.

### BACKGROUND

The facts of this case are described in the Findings and Recommendation and need not be repeated at length. Defendant operates two fruit processing plants near Dallas, Oregon, which produce dried specialty fruits, including cranberries, cherries, blueberries, apples, and strawberries. Affidavit of Joseph Meduri ¶ 3. Operations occur primarily at its Dyck Road facility, although its Fir Villa Road facility processes some cherries and prunes. *Id.* ¶ 2.

Dehydrating the fruit creates wastewater. *Id.* ¶ 4. As of the filing of this lawsuit, defendant's system for disposing of this wastewater included screening the waste-water to remove solids, adjusting its pH level, and collecting the water in above-ground holding tanks. *Id.* Ex. C at 14–15. At the Dyck Road Facility, the water is transferred from the holding tanks into a three million gallon holding pond. *Id.* ¶ 8. During the months of April through October, defendant uses wastewater from the holding pond to irrigate its prune orchards and grass fields. *Id.* ¶ 7. Wastewater from the Fir Villa facility is drawn directly from the storage tanks to irrigate defendant's fields during the months that plant is in operation (June through October). *Id.* ¶ 15.

### ARGUMENTS

Plaintiffs filed suit on May 23, 2002, pursuant to Section 505 of the Federal Water Pollution Control Act. 33 U.S.C. § 1365 (commonly known as the "Clean Water Act"). Plaintiffs allege:

> defendant has discharged and continues (or is reasonably likely to continue) to discharge pollutants from point sources to the waters of the United States without a National Pollutant Discharge Elimination System (NPDES) permit, a violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

Complaint ¶ 2. Citing numerous complaints made to the Oregon Department of Environmental Quality (DEQ) between June 1997 and June 2001, a report produced by soil scientist Philip Small, water samples taken from defendant's drainage ditches in spring 2002, and observations of Plaintiff Wayne Hiebenthal (a former prune farmer), plaintiffs argue that defendant's land application of its wastewater requires an NPDES permit because its "irrigation" is resulting in more wastewater on its fields than the crops can utilize, contaminating the local watershed.

Defendant argues that plaintiffs have failed to present any evidence that defen-

dant continues or is likely to continue discharging pollutants from a point source in violation of the Clean Water Act. Defendant contends (1) plaintiffs' evidence shows no real likelihood of repeated violations; and, even if it did, (2) return flows from irrigated agriculture are exempt from the Clean Water Act's NPDES requirements. *See* 33 U.S.C. § 1362(14) (exempting "agricultural stormwater discharges and return flows from irrigated agriculture" from the definition of "point source" and regulation under the Act).

The Magistrate Judge concluded that plaintiffs had failed to establish that defendant is reasonably likely to continue to discharge contaminants, and he recommended granting defendant's motion for summary judgment. Findings and Recommendation at 8. He did not address defendant's second argument: that the Clean Water Act exempts return flows from irrigated agriculture from the NPDES permit requirements.

### DISCUSSION

The Clean Water Act provides subject matter jurisdiction for citizen suits against any person alleged "to be in violation" of an effluent standard or limitation or an administrative order. 33 U.S.C. § 1365(a)(1). As the Magistrate observed, a plaintiff must be able to allege that the violations are ongoing, pointing either to "violations that continue on or after the date the complaint is filed" or to "evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 671 (9th Cir.1988) (quoting *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir.1988)).

Viewing the evidence most favorably to the non-moving party, the court cannot conclude, as the Magistrate did, that plaintiffs have failed to produce evidence from which a reasonable trier of fact could find a likelihood of continuing discharge of pollutants from defendant's property. Plaintiffs have submitted water samples from ditches abutting defendant's property with elevated Biological Oxygen Demand (BOD) and a report from a soils scientist warning that "incomplete soil-based treatment of oxygen demanding organic wastewater" from defendant's processing plant applied to its crops "has resulted in discharge of oxygen demanding constituents to surface waters." Both are adequate to support an inference that the water draining from defendant's property is polluted and that continued discharge is reasonably likely. However, because certain exemptions in the Clean Water Act apply, this court lacks jurisdiction, and the Findings and Recommendation is adopted on alternative grounds.

Simply proving the runoff is contaminated does not provide this court with subject matter jurisdiction. Plaintiffs must show: (1) the discharge of a pollutant; (2) without an NPDES permit; (3) from a point source. 33 U.S.C. §§ 1311(a), 1342(a)(1). "A cornerstone of the Clean Water Act is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United States is unlawful unless the discharge is made according to the terms of an NPDES permit obtained from either the United States Environmental Protection Agency ("EPA") or from an authorized state agency." *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.*, 299 F.3d 1007, 1009 (9th Cir.2002). Plaintiffs may be able to show that defendant is discharging pollution into the navigable waters without an NPDES permit, but they cannot show defendant is doing so from a point source.

Congress specifically exempted agricultural fields from the definition of a "point

source." "The term 'point source' means any discernible, confined and discrete conveyance .... This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. 1362(14). The implementing regulations are more specific: "Any introduction of pollutants from non point-source agricultural and silvicultural activities, including storm water runoff from orchards, cultivated crops, pastures, range lands, and forest lands" does not require an NPDES permit. 40 C.F.R. § 122.3. *See also* 64 Fed.Reg. 68,722 at 68,724–25 ("Although water quality problems also can occur from agricultural storm water discharges and return flows from irrigated agriculture, this area of concern is statutorily exempted from regulation as a point source under the Clean Water Act.").

■ Plaintiffs argue unpersuasively that the Clean Water Act's exemptions for irrigated agriculture are inapplicable to defendant's operations because defendant's possible over-application of fruit processing wastewater to its crops is more akin to industrial, non-agricultural activities. The only case to support this position was decided seven years before Congress added the exemption for agricultural runoff to the Clean Water Act. *United States v. Oxford Royal Mushroom Products, Inc.,* 487 F.Supp. 852, 854 (E.D.Pa.1980) (holding that the spraying of an overabundance of wastewater onto irrigation fields may qualify as a point source); *see* Pub.L. 100–4, Title V, §§ 502(a), 503 (1987). The Clean Water Act leaves regulation of irrigation return flows and agricultural runoff to the states, regardless of the quality of the water used to irrigate the fields. *Community Association for Restoration of the Environment v. Henry Bosma Dairy,* 305 F.3d 943, (9th Cir.2002) (finding that fields where dairy applied wastewater were not subject to the agricultural exemption because they were part of defendant's "Concentrated Animal Feeding Operation" which is expressly designated by the Clean Water Act as a point source). Plaintiffs' evidence may show that defendant is applying wastewater to its fields in excess of the crops' actual absorption of that water. While this may support a revision of defendant's state Water Pollution Control Facilities Permit, it does not provide the court with federal subject matter jurisdiction under the Clean Water Act.

### CONCLUSION

For the foregoing reasons, plaintiffs have failed to show that the court has subject matter jurisdiction under the Clean Water Act. The Magistrate's Findings and Recommendation is adopted on alternative grounds. Defendant's Motion to Dismiss (doc. # 4) is GRANTED.

**IT IS SO ORDERED.**

## FINDINGS AND RECOMMENDATION

ASHMANSKAS, United States Magistrate Judge.

Defendant Meduri Farms, Inc. ("Defendant"), seeks dismissal of the citizen suit filed against it by plaintiffs Wayne and David Hiebenthal ("Plaintiffs") under the Federal Water Pollution Control Act (33 U.S.C. §§ 1251–1387)(the "Act"). The complaint, which was filed in this court on May 23, 2002, alleges that Defendant:

> has discharged and continues (or is reasonably likely to continue) to discharge pollutants from point sources to the waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit, a violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a).

Defendant contends that it has remedied the runoff problems and that Plaintiff cannot prove that it continues or is reasonably likely to continue to discharge pollutants in

violation of the Act. Alternatively, Defendant argues that the runoff from its prune and grass acreage is properly characterized as "irrigation return flows" or "agricultural storm water" and is exempt under the Act.

## BACKGROUND

Defendant runs a fruit processing operation near Dallas, Oregon, at two separate facilities. The larger facility, which operates all year, is referred to as the Dyck Road facility. The smaller facility, which operates from June to October only, is referred to as the Fir Villa facility.

Defendant's activities at the facilities generate wastewater, the disposal of which is regulated by the Oregon Department of Environmental Quality ("DEQ") through a Water Pollution Control Facilities ("WPCF") permit. In its early Process Wastewater Management Plan ("PWMP"), Defendant proposed applying its wastewater as irrigation to its 75 acres of prune trees and 140 acres of grass seed. This proposal was adopted and incorporated into Defendant's initial WPCF permit. In the fall of 2001, DEQ imposed additional limitations on Defendant's disposal of its wastewater in response to complaints about runoff from Defendant's facilities entering the nearby Baskett Slough National Wildlife Refuge (the "Slough"). Defendant's revised PWMP proposed restricting Defendant's ability to apply the wastewater as irrigation to the period from April to October and restricting the amount of wastewater applied as irrigation to specified agronomic rates. The revised PWMP was approved and the current WPCF permit was issued in December 2001 incorporating these restrictions (the "Permit").

To meet the new restrictions of the Permit, Defendant constructed a three million gallon holding pond at the Dyck Road Facility to hold the wastewater during the winter. Defendant installed an emergency overflow pipe on the southeast corner of the pipe to allow the top layer of rainwater to overflow if necessary. Additionally, Defendant installed evaporation tanks with the ability to evaporate between 15,000 and 20,000 gallons of wastewater a day. The installation of the evaporation tanks allows Defendant to reduce the amount of wastewater applied as irrigation and to accommodate increased rainfall during the winter months by allowing Defendant to draw down the holding pond. Finally, Defendant sealed off catch basins and drains in the paved area around the holding pond to route storm water to Defendant's storm water discharge system rather than the holding pond. All of these improvements were made with the approval of the DEQ and became fully functional in early 2002.

From 1997 to 2001, DEQ received complaints from numerous sources about Defendant's operations.[1] In June 1997, Defendant was found to be discharging cherry processing water into a drainage ditch that empties into the Slough without a permit in violation of Oregon law. Similar complaints about the drainage ditch were made in late 1997 and again in February 2000. In March 1999 and March and April 2001, DEQ received complaints that excessive wastewater irrigation from Defendant's facilities was causing surface water to runoff into roadside ditches and, ultimately, enter the Slough. These complaints resulted in the increased restrictions imposed by DEQ in the fall of 2001 and the construction of the improvements set forth in the Permit.

---

1. The complaints discussed here are supported by the DEQ records offered by Defendant. Plaintiffs allege that additional complaints were made between June 1997 and June 2001. Plaintiff does not offer any complaints about excessive water runoff after June 2001.

Since the implementation of the improvements, DEQ has investigated two complaints about Defendant's operations. The first one, received on February 25, 2002, reported a continuing orange discharge. DEQ determined that the coloration was residual and would likely flush out. The second complaint, which was made to Defendant in August 2002, was about an odor emanating from Defendant's holding ponds. After completing an inspection at the request of Defendant, DEQ found that Defendant's facilities were operating in compliance with the terms of the Permit. In response to the complaint, DEQ found that the odors were not excessive and suggested that an aeration system be installed prior to the start up of the next processing season. No complaints about excessive runoff have been investigated by DEQ since the installation of the improvements.

## LEGAL STANDARD

Courts grant motions to dismiss under Rule 12(b)(6) only if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). The review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. *Cassettari v. County of Nevada,* 824 F.2d 735, 737 (9th Cir.1987).

Matters outside the pleadings are not usually appropriate on a motion to dismiss. *Cassettari v. Nevada County, Cal.,* 824 F.2d 735, 737 (9th Cir.1987). However, the court may convert the motion to one for summary judgment after reasonable notice to the parties. Fed.R.Civ.P. 12(b). Here, Defendant filed additional materials with its motion for summary judgment and asked the court to convert the motion to dismiss to one for summary judgment. Plaintiff also filed additional materials with their opposition brief and does not object to the consideration of this motion under the summary judgment standard. Accordingly, the court will consider this motion as a motion for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 165 (1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are

genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## DISCUSSION

Defendant argues that this court lacks subject matter jurisdiction because Plaintiffs have not shown an ongoing violation of the Act. Defendant also asserts that the runoff which Plaintiffs complain about is properly characterized as "irrigation return flows" or "agricultural storm water" and is exempt under the Act. Because the first argument goes to the jurisdiction of this court to hear this matter, the court will address it initially.

The Act allows citizen suits against any person alleged "to be in violation" of the Act. 33 U.S.C. § 1365(a). The United States Supreme Court has read this language literally, so that a citizen suing for violations of the Act must be able to allege that those violations are ongoing. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49–58–64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

Specifically, the Supreme Court has held that Section 1365 of the Act "does not permit citizen suits for wholly past violations." *Id.* at 64, 108 S.Ct. 376. However, Section 1365 "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good faith allegation of continuous or intermittent violation * * *." Thus, citizen-plaintiffs do not have to prove their allegations for jurisdiction to attach. *Id.* Instead, summary judgment is the proper procedure for defendants to use to establish that such allegations are in fact un-

true. *Id.* at 65–66, 108 S.Ct. 376. In addition, claims can become moot if, after a good faith suit is filed, it becomes "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 66, 108 S.Ct. 376 (citation omitted).

Shortly after the Supreme Court decided *Gwaltney,* the Ninth Circuit agreed with the Fourth Circuit "that a citizen-plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'" *Sierra Club v. Union Oil Co. of California,* 853 F.2d 667, 671 (9th Cir.1988)(quoting *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171–72 (4th Cir.1988)("*Gwaltney II* ")). In addition, the Ninth Circuit agreed that " '[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is *no real likelihood of repetition.*'" The focus for the court is " '*whether the risk of defendant's continued violation had been completely eradicated* when citizen-plaintiffs filed suit.'" *Id.* (quoting *Gwaltney II,* 844 F.2d at 172)(emphasis added by Ninth Circuit.)

Plaintiffs allege in their complaint that Defendant has discharged pollutants into the waters of the United States in violation of the Act and that such discharges continue, or are reasonably likely to continue. There is no dispute that Defendant has, in the past, discharged pollutants into the Slough. Therefore, the only issue is whether Defendant continues, or is reasonably likely to continue, to discharge pollutants.

Defendant engaged in major improvements to its water elimination system in late 2001. Since then, no complaint about

excessive irrigation or runoff has been made to DEQ. The two complaints that were investigated were found to be unwarranted and in August 2002, the DEQ found Defendant to be in compliance with the Permit. In the preceding years, the majority of the complaints about Defendant's excessive runoff were made in the early part of the year. After the improvements were implemented in late 2001, no complaints were made during that same time period. It appears that Defendant has remedied its previous problems with successive runoff and that future excessive irrigation is extremely unlikely.

Plaintiffs argue that the Permit and Defendant's current irrigation practices result in overwatering of the prune orchards. The issue before the court is not whether Defendant's prune orchards are being properly handled but, rather, whether Defendant is abiding by the terms of the Permit and applying wastewater irrigation to the prune orchards at the agronomic rate approved of by DEQ.

Plaintiffs have also presented an expert who opines that Defendant's current water treatment procedure results in "oxygen demanding constituents to surface waters" and that Defendant has failed to address the treatment of biochemical oxygen demand currently in its wastewater. As noted above, in August 2002, DEQ found Defendant to be in compliance with the Permit. This would rebut Plaintiffs' expert opinion. Additionally, Defendant represents that it is in the process of evaluating options for installing an aerator, which would address some of Plaintiffs' expert concerns.

Plaintiffs' expert also expresses concern that Defendant's three million gallon holding pond is insufficient to handle possible storm conditions. The expert does not provide the magnitude of the storms which he is concerned about or the likelihood of such storm occurring. On the other hand,

Defendant has installed evaporation tanks that will virtually empty the holding pond at the end of the summer in preparation for the winter months and will continue to drain down the holding pond at a rate of 15,000 to 20,000 gallons a day. It appears that Defendant has adequately addressed winter storage of its wastewater and it is unlikely that an average winter storm will result in discharge of contaminants from the holding ponds.

As stated in *Gwaltney* and its progeny, the time for determining whether a citizen-plaintiff has made a good faith allegation of continuing discharge is at the time the complaint was filed. Plaintiffs have presented an affidavit indicating that they took samples of water from a drainage ditch along Defendant's facilities on February 26, 2002, March 15, 2002, and May 15, 2002. The samples were analyzed and showed a biological oxygen demand ("BOD") of 1,305.8, 591.0 and 825 milligrams per liter and a pH of 5.36, 5.54 and 6.34, respectively. Plaintiffs failed to provide the court with normal or desirable results for BOD or pH and, as a result, the court is unable to determine effect of these test results. Also, Plaintiffs have failed to establish that the waters in the drainage ditch came exclusively from Defendant's facilities and were not commingled with waste or irrigation water from other operations located along the drainage ditch. Finally, Defendant did not use wastewater for irrigation purposes in February or March 2002. Accordingly, it is reasonable to assume that the water in the drainage ditch was not runoff from Defendant's irrigation operations but originated from a different source.

Plaintiffs' remaining evidence, offered by its expert, was an opinion based on a review of Defendant's revised PWMP and a tour of the perimeter of the facilities on August 8, 2002. The PWMP reviewed by

the expert was written prior to the implementation of the improvements and would not take those into account. The tour of the facilities took place well after the complaint was filed and is not relevant to whether Plaintiffs' allegations were made in good faith.

In light of Defendant's major improvements to its water storage system, the lack of any complaints about excessive runoff since the improvements and DEQ's determination in August 2002 that Defendant was complying with the requirements of the Permit, the court finds that Plaintiffs have failed to present evidence to support their allegation that Defendant continues, or is likely to continue, to discharge contaminants. Additionally, the evidence does not justify a finding that Plaintiffs made those allegations in good faith at the time the complaint was filed. In the absence of such evidence, the court finds that Plaintiffs are unable to support a citizen's suit under the Act and that the court lacks jurisdiction over this action.

## CONCLUSION

Defendant's motion (4) to dismiss should be GRANTED.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **October 8, 2002.** If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due **October 23, 2002,** and the review of the Findings and Recommendation will go under advisement on that date.