Beryl LOCKETT, et al.

v.

**ENVIRONMENTAL PROTECTION AGENCY, et al.**

**No. CIV A. 00–0989.**

United States District Court, E.D. Louisiana.

Nov. 14, 2001.

Maurice J. Le Gardeur, Jr., Covington, LA, for Plaintiffs.

Roy Edward Blossman, Leann Opotowsky Moses, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, New Orleans, LA, William W. Thompson, III, Donald H. Grissom, Grissom & Thompson, LLP, Austin, TX, Joseph Bernstein, Covington, LA, for Intervenor-Plaintiffs.

Kathryn Weekley Becnel, Orelia E. Merchant, U.S. Attorney's Office, New Orleans, LA, Gerald J. Nielsen, Thomas Christopher Pennebaker, William Ross DeJean, Nielsen Law Firm, Metairie, Michael Stephen Rolland, Law Offices of Michael S. Rolland, New Orleans, LA, Ron S. Macaluso, Christian Albert Garbett, Ron S. Macaluso, APC, Hammond, LA, for Defendants.

## ORDER AND REASONS

LEMMON, District Judge.

Defendants Village of Folsom, Marshell Brumfield, and Merty Fitzmorris have filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (Document 53). **IT IS ORDERED** that plaintiffs' claims under the Clean Water Act are **DISMISSED WITH PREJUDICE.** Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE.**

### A. Factual Background.

The eight plaintiffs own property in and around Folsom, Louisiana. On August 12, 1999, plaintiffs Carl and Beryl Lockett sent a "Notice of Violations and Notice of Intent to Sue for Violations of the Clean Water Act on a Ravine Running Over and Across Private Property in State of Louisiana" to the Administrator of the Environmental Protection Agency (EPA); defendant Brumfield, Folsom's Mayor; and defendant Fitzmorris, Folsom's Village Administrator. Copies of the notice were also delivered to numerous other public officials, state and local governmental departments, and civic groups. The Locketts claimed that Folsom had allowed its sewage treatment plant to emit both treat-

ed and untreated effluvient and sewage into a ravine which runs directly through their property. Among other violations of federal law, the Locketts claimed that these emissions exceeded the levels specified in the plant's National Pollutant Discharge Elimination System (NPDES) permit. An appendix to the letter set forth a summary of the sewage plant's alleged violations of state and federal law from 1983 through 1999.

On November 4, 1999, the Louisiana Department of Environmental Quality (DEQ) issued a Compliance Order to Folsom under LSA–R.S. 30:2025 C. for the sewage plant's violations. The Compliance Order addressed sampling, operation, and maintenance violations discovered on March 23, 1998; miscellaneous additional violations discovered on January 14, 1999; a failure to record totalizer readings discovered on August 11, 1999; permit violations occurring between August 1996 and May 1999; untimely Discharge Monitoring Report submissions for various months between January 1997 and December 1998; and incomplete noncompliance reports. Since that time, the DEQ has been prosecuting an enforcement action against Folsom.

On December 7, 1999, the Locketts issued a second notice letter to Folsom and the EPA. This notice incorporated by reference the contents of the August 12, 1999 notice, and was sent via certified mail to J. Dale Givens as the Secretary of the DEQ (among others).

The Locketts filed suit on March 31, 2000, contending that defendants' actions violated the Clean Water Act, Louisiana statutory law, and the Louisiana constitution. Four additional plaintiffs, the Asevedos and the Ruberts, intervened on September 28, 2000, and two further plaintiffs, the Kings, intervened on July 5, 2001. Plaintiffs sought a declaratory judgment, a prohibitory injunction, a mandatory injunction (requiring Folsom to reroute the sew-

age pathway), damages, civil penalties, costs, and fees.

On August 20, 2001, the DEQ issued a Penalty Assessment under LSA–R.S. 30:2025 E. against Folsom. The assessment order recited the violations that had been noted in the November 4, 1999 Compliance Order, and stated that Folsom had received a notice of potential penalty on May 3, 2000. It assessed a $466,450.00 penalty against Folsom, together with legal interest and costs. That assessment has been appealed administratively, and is therefore not final, and has not been paid.

## B.  Analysis.

### 1.  General standards for citizen suits under the Clean Water Act.

33 U.S.C. § 1365 governs citizen suits under the Clean Water Act. § 1365(a)(1) generally provides that a citizen "may commence a civil action on his own behalf" against a person who either violates an effluent standard or limitation set forth in the Act or violates an order issued by the EPA Administrator. The ability to sue under § 1365(a)(1), however, is not unlimited. First, § 1365(b) provides that "No action may be commenced" under § 1365(a)(1) if the EPA or any state "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State" to require compliance with the standard, limitation, or order.

Second, the first sentence of § 1365(a) explicitly states that a citizen may commence a civil action under it "Except as provided in subsection (b) of this section and section 1319(g)(6) of this title." § 1319(g) generally sets forth the standards for the assessment of penalties by the EPA. § 1319(g)(6) is subdivided into two sections. § 1319(g)(6)(A) provides that if the EPA "has commenced and is diligently prosecuting an action under this

subsection," or if a state is doing so "under a State law comparable to" § 1319(g), then any such violation "shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title." *See* 33 U.S.C. § 1319(g)(6)(A)(i) (applying to EPA actions); *id.* at § 1319(g)(6)(A)(ii) (applying to state actions under comparable state laws). Under the plain language of this section, therefore, a "diligently prosecut[ed]" EPA or state action displaces a citizen suit under the conditions described in the statute. § 1319(g)(6)(A), however, is itself subject to an exception, which is set forth in § 1319(g)(6)(B):

> The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which -
>
> (i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or
>
> (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement to an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

In summary, § 1319(g)(6) states that any violation for which the EPA or a state "has commenced and is diligently prosecuting" an action shall not be subject of a civil penalty action under § 1365, **unless** either (1) the § 1365 suit was filed before commencement of the action, or (2) adequate notice was given and the citizen suit came with 120 days of the notice.

Defendants argue that plaintiffs' suit is not permissible under the Act. They contend that the DEQ enforcement proceeding is "an action" under a state statute that is comparable to § 1319(g), and that it is being "diligently prosecut[ed]." They further argue that plaintiffs do not fall within the exception set forth in § 1319(g)(6)(B) because their suit was not filed prior to the commencement of the enforcement proceeding, nor did it come within 120 days of a notice of an alleged violation.

2. **Does the DEQ enforcement proceeding constitute "an action under a State law" comparable to § 1319(g) that is being "diligently prosecut[ed]"?**

■ Plaintiffs initially contend that because the DEQ has not brought a judicial action against defendants, their suit may proceed because an administrative proceeding cannot preclude a citizen suit. While numerous courts analyzing preclusion under § 1365 have focused on whether a judicial proceeding has been filed by the EPA or a state environmental agency, the language of § 1365 differs from § 1319, for § 1365(b)(1)(B) requires the commencement of "a civil or criminal action in a court of the United States, or a State." By contrast, § 1319(g)(6)(A)(i) and (ii) require only an "action" under federal or state law.

Plaintiffs rely on *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883 (9th Cir.1993) for the proposition that a judicial action is necessary to preclude a citizen suit under § 1319(g)(6)(A). In that case, the EPA issued a compliance order stating that a textile mill was violating its effluvient permit. No penalties were pursued against the mill. Plaintiffs later commenced suit for the mill's permit violations. The Ninth Circuit held that it was the EPA's failure to seek penalties, not its failure to file a judicial action, that allowed plaintiffs' suit to proceed:

The plain language of the statute states that such suits are barred only when the EPA is prosecuting an action "under this subsection," i.e., section 1319(g), which deals only with administrative penalty actions. We are unaware of any legislative history demonstrating a congressional intent to extend the bar on citizen suits created in section 1319(g)(6)(A) to a context other than an administrative penalty action. In this case, the EPA was not pursuing an administrative penalty under section 1319(g). Rather, the EPA acted pursuant to section 1319(a) when it issued a compliance order to Pendleton. The imposition of an administrative penalty requires elaborate procedures including hearings as well as public notice and comment, none of which took place. 33 U.S.C. § 1319(g)(4). Nor did the EPA purport to issue its compliance order pursuant to the provision of section 1319(g).

*Id.* at 885. *Pendleton Woolen Mills,* therefore, is distinguishable from this administrative penalty action, where the DEQ ultimately issued a $466,450 penalty assessment against Folsom under state law for the violations set forth in the November 4, 1999 Compliance Order.[1]

Because the DEQ enforcement proceeding constitutes an "action," the next question is whether the action is under "a State law comparable to" § 1319(g). Plaintiffs argue that Louisiana law is not comparable to federal law because state law does not contain the public notice requirements set out in § 1319(g)(4)(A), (B), and (C). Under these subsections, the EPA must provide public notice and a "reasonable opportunity to comment" before issuing "an order assessing a civil penalty." If a person comments on a proposed assessment, he or she "shall be given notice of any hearing held under this subsection and of the order assessing such penalty," and shall be given "a reasonable opportunity to be heard and to present evidence." Further, if no hearing is held, any person who commented is given the opportunity to set aside the order within 30 days of its issuance.

While the Fifth Circuit has not addressed the issue, several courts have held that it is not necessary for a state environmental scheme to contain notice requirements that are identical to federal law for

---

1. Several courts have disagreed with the view adopted in *Pendleton Woolen Mills* that a penalty action is a necessary prerequisite for preclusion. In *North and South Rivers Watershed Ass'n v. Town of Scituate,* 949 F.2d 552 (1st Cir.1991), the First Circuit held that:

    The primary function of the provision for citizen suits is to enable private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act. Congress has found it necessary expressly to "recognize, preserve and protect *the primary responsibility and rights of the States* to prevent, reduce and eliminate pollution." It follows that "the citizen suit [under section 505] is meant to supplement rather than to supplant governmental [enforcement] action." Presumably, then, when it appears that governmental action under either the Federal or comparable State Clean Water Acts begins and is diligently prosecuted, the need for citizen's suits vanishes.

    Appellant argues that if it can be found that governmental action to correct the violation which is being diligently pursued nevertheless has not specifically demanded a financial penalty, a citizen's suit may be instituted. Such an interpretation of section 309(g) would enable citizen's suits to undermine the supplemental role envisioned for section 505 citizen's suits, "changing the nature of the citizen's role from interstitial to potentially intrusive."

    *Id.* at 555 (italics in original) (*quoting* 33 U.S.C. § 1251(b) and *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)).

the state proceeding to be comparable to it under § 1319(g)(6)(A)(ii):

> The common thread running through these cases [analyzing notice requirements] is a finding that the overall regulatory scheme affords significant citizen participation, even if the state law does not contain precisely the same public notice and comment provisions as those found in the federal CWA. We agree with the reasoning in *[North and South Rivers Watershed Ass'n v. Town of] Scituate* that the comparability requirement may be satisfied so long as the state law contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguard their legitimate substantive interests. Under those circumstances, the state statute should be presumed comparable unless the facts of the specific case demonstrate that the state denied an interested party a meaningful opportunity to participate in the administrative enforcement process.

*Arkansas Wildlife Federation v. ICI Americas, Inc.,* 29 F.3d 376, 381 (8th Cir. 1994) (citing *North and South Rivers Watershed Ass'n v. Town of Scituate,* 949 F.2d 552 (1st Cir.1991)), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995). The analysis of whether a particular state scheme is comparable to federal law must necessarily be done on a state-by-state basis. Because Louisiana law is not identical to that of other states, the value of precedent analyzing whether a particular state's law is comparable to federal law is limited. However, *Jones v. City of Lakeland,* 224 F.3d 518 (6th Cir. 2000) (*en banc*) is an instructive opinion that decided that the Tennessee statutory provision regulating clean water was not

comparable to federal law due to notice differences:

> An examination of the TWQCA [Tennessee Water Quality Control Act] reflects that it requires no public notice of hearings, nor does it require the State to extend third parties an opportunity to initiate or join mandatory controversial issues seeking justiciable resolution such as enforcement proceedings and consent orders similar to those unilaterally considered and approved by the TDEC [Tennessee Department of Environment and Conservation]. Nor does the Tennessee Open Meetings Act mandate procedures for public participation in an ongoing enforcement prosecution under the TWQCA by TDEC or before the Water Quality Control Board. Thus, TDEC attempts to artfully invoke the protection of a "diligent prosecution" of an ongoing enforcement action while its unilateral discretionary authority permits it to declare citizen or public participation "duplicitous or frivolous," so that the plaintiffs and other similarly situated citizens can be frozen out of commencing an original action, or intervening in an ongoing State enforcement action.

> The only window for redress available to the plaintiffs in the instant case, and others similarly situated, occurs in an ongoing administrative action by the TDEC before the Water Quality Control Board when Tennessee law requires that, if a consent judgment is entered between the TDEC and an offending party and filed with the chancery court, the court shall withhold final judgment for forty-five days during which adversely affected parties shall be permitted to intervene. Needless to say, the language ... presupposes that a final order of the TDEC has been filed with the chancery court as a condition precedent to invoking its jurisdiction .... *[Not] one of the four orders* issued by the

TDEC and/or Water Quality Control Board, relied upon by the district court in arriving at its decision, *were filed with the chancery court by the State or any of its agencies during the ten or more years of this ongoing enforcement proceeding.* Consequently, the plaintiffs and other similarly affected citizens are, at the discretion of the TDEC, denied access to both the courts and to a meaningful opportunity to participate at significant stages of the administrative decision-making process, to adequately safeguard their legitimate interests as mandated by the Clean Water Act. Accordingly, the TWQCA and related Tennessee statutes are not comparable to 33 U.S.C. § 1365(a)(1)(b) and/or 33 U.S.C. § 1319(g)(6).

*Id.* at 523–24 (citations omitted; italics in original).

In this case, the notice requirements of state law do not render Louisiana law incomparable to federal law, and the notices actually provided to plaintiffs demonstrates the comparable nature of the two statutory schemes. The Louisiana statute specifically provides for public notice of a penalty determination:

> After submission for a penalty determination at a hearing, the secretary or assistant secretary shall provide an opportunity for relevant and material public comment relative to any penalty which may be imposed.

LSA–R.S. 30:2025 E.(5). In addition, the record reflects that plaintiffs have, in fact, participated at certain stages in the enforcement proceeding, and have formally intervened into the administrative penalty proceeding.

■ Because the DEQ compliance action is under a state law that is "comparable to" § 1319(g), the next question is whether the DEQ is "diligently prosecuting" its action. Courts have not adopted a bright-line test for determining diligent

prosecution. In *ICI Americas* plaintiffs argued that the state had not diligently prosecuted an enforcement action against a polluter because even though daily penalties could have reached $170,000, only a few $500 penalties were assessed. The court disagreed, noting that the polluter had implemented a comprehensive remedial action plan, spent approximately half a million dollars making technical changes, and ultimately came into compliance with effluvient standards under its permit. It therefore held that "[i]t would be unreasonable and inappropriate to find failure to diligently prosecute simply because ICI prevailed in some fashion or because a compromise was reached." *ICI Americas,* 29 F.3d at 380.

Plaintiffs argue that the DEQ proceeding has not been diligently prosecuted because there have been 18 years of noncompliance, because the DEQ has allegedly allowed Folsom to set its own schedule for compliance, and because the penalty that has been assessed is not final and subject to modification. However, the DEQ enforcement proceedings began with the issuance of the Compliance Order on November 4, 1999. Since that time, the DEQ has diligently prosecuted its action, and in fact assessed a $466,425.00 fine against Folsom as part of the enforcement proceeding only a year and a half after it commenced. While plaintiffs complain that this amount is subject to further negotiation and is not final, the deposition testimony of R. Bruce Hammatt, the Administrator in Enforcement for the DEQ, indicates that it is unlikely that the fine will be waived or forgiven. Plaintiffs' mere disagreement with the amount of the fine or with the DEQ's discretion to potentially reduce it as part of any settlement with Folsom does not indicate that it has not diligently prosecuted the enforcement proceeding.

### 3. Did any of the plaintiffs provide adequate notice and file suit within 120 days thereafter?

§ 1319(g)(6)(B)(ii) provides that if plaintiffs gave adequate notice of alleged violations and sued within 120 days of such notice, their claims under the Clean Water Act may proceed regardless of whether the DEQ is diligently prosecuting its enforcement action. The only plaintiffs who could conceivably avail themselves of this provision are the Locketts; it is undisputed that none of the other plaintiffs gave notice.

■ Initially, defendants argue that the Locketts' notices did not comply with statutory prerequisites because they did not cite the specific standard, limitation, or order violated, and did not provide the dates of the violations. While the Locketts' notices did not catalogue the violations in excessive detail, Appendix "A" to the notices consists of a five-page specific listing of Folsom's violations. In *Louisiana Environmental Action Network, Inc. v. Evans Industries, Inc.*, No. 95–3002, 1997 WL 824310, at *4 (E.D.La. Sept. 30, 1997), this court rejected a similar argument:

> Defendant argues that notice was insufficient because the notice does not identify the activity alleged to violate an EPA standard, does not identify a specific standard, limitation, or order violated, and does not provide the dates of the violations. In this case, while plaintiff's *letter* did not catalogue the violations in detail, the attached addendum gave as much information as was publicly available through defendant's filings with the EPA.

*Louisiana Environmental Action Network,* 1997 WL 824310, at *4 (italics in original).

■ Second, defendants argue that the Locketts did not file suit within 120 days of their notice. The Locketts concede that suit was filed more than 120 days after the August 12, 1999 notice (they filed suit on March 31, 2000), but argue that the August 12 notice did not comply with 40 C.F.R. § 135.2, for it was not sent to the "chief administrative officer of the water pollution control agency" of Louisiana. The Locketts therefore focus on the reissued December 7, 1999 notice, and argue that their suit came within 120 days of that date.

The first and second notices are substantively identical (with the second simply incorporating the first), and the only relevant distinction is that the second letter included the specific name of the Secretary of the Louisiana Department of Environmental Quality. Typically, plaintiffs in similar circumstances have argued the opposite position from that now advanced by the Locketts, claiming that their failure to strictly comply with the precise terms of the applicable regulation should be excused. Courts have held that a minor, hypertechnical deviation from the regulation does not render a notice ineffectual. *See Louisiana Environmental Action Network,* 1997 WL 824310, at *4 (holding that notice sent to "Evans Cooperage Company, Inc. (a/k/a Evans Industries)" was sufficient under 40 C.F.R. § 135.2, even though individual named on pollution discharge permit was "Evans Industries, d/b/a Evans Cooperage"); *Sierra Club v. Raytheon Co.,* No. 84–1785, 1984 WL 2239, at *3 (D.Mass.1984) (holding that although notice was sent to company's president and plant supervisor instead of to its registered agent as required by 40 C.F.R. § 135.2, "such a highly technical flaw in giving notice" did not deprive court of jurisdiction); *cf. Bettis v. Town of Ontario,* 800 F.Supp. 1113, 1118 (W.D.N.Y.1992) (holding that while "some of the more technical departures" from statutory notice requirements "could perhaps be forgiven," nevertheless plaintiff's suit had to be dis-

missed because "[m]ost of the defendants, in fact, were not apprised of anything at all, since they never received notice of any kind.").

Because the August 12, 1999 notice was sufficient to begin the 120–day period, the Locketts cannot avail themselves of the exception contained in § 1319(g)(6)(B)(ii). If the Locketts were allowed to merely reissue notice and sue within 120 days of the new notice date, the 120–day limitation would be meaningless; a plaintiff could postpone suit indefinitely by merely reissuing notice letters when any given 120–day period neared its end.

### 4. What is the scope of preclusion?

One final issue before the court is whether the DEQ enforcement proceeding precludes only plaintiffs' claim for civil penalties, or whether it precludes all of plaintiffs' federal claims. The court finds that all such federal claims are barred. As the Eighth Circuit has held:

> We do not go so far as to say that it would be "absurd" to preclude citizens' claims for civil penalties without also precluding claims for declaratory and injunctive relief under the same circumstances. However, we agree with the First Circuit's assessment of such a result as "unreasonable." Allowing suits for declaratory and injunctive relief in federal court, despite a state's diligent efforts at administrative enforcement, could result in undue interference with, or unnecessary duplication of, the legitimate efforts of the state agency. We believe that such a result would undermine, rather than promote, the goals of the CWA, and is not the intent of Congress.

*ICI Americas*, 29 F.3d at 383; *Scituate*, 949 F.2d at 557–58 (holding that it would be not only "undesirable" but "absurd" to only preclude claims for civil penalties but not declaratory and injunctive relief).

Plaintiffs may still maintain their tort and constitutional claims under Louisiana law in state court.

### C. Conclusions.

Because the Louisiana DEQ has commenced and is diligently prosecuting an enforcement action against Folsom under a state law comparable to § 1319(g), plaintiffs' federal claims are precluded under § 1319(g)(6)(A)(ii). Because there are no federal questions remaining in this case, the court dismisses plaintiffs' supplemental state law claims without prejudice to their being urged in state court.