COLLEGE PARK HOLDINGS, LLC, Plaintiff,

v.

RACETRAC PETROLEUM, INC., Defendant and Third Party Plaintiff,

v.

Camden Oil Company, LLC; Petroleum Realty II, LLC; USRP (Hollis), LLC; Trico V Petroleum, Inc.; and Merchant Investment Group, Inc., Third–Party Defendants.

No. CIV.A.1:01–CV–1128–B.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 31, 2002.

---

James Daniel Levine, Russell James Rogers, McKenna Long & Aldridge, Atlanta, GA, Craig A. Sturtz, Kendra S. Sherman, Vincent Atriano, Squire Sanders & Dempsey, Columbus, OH, for Plaintiff.

Peter M. Degnan, Robert Douglas Mowrey, Daniel Niles Esrey, David M. Meezan, Alston & Bird, Atlanta, GA, Daniel S. Reinhardt, Douglas Alton Henderson, Debra S. Cline, Atlanta, GA, for Defendant.

## ORDER

MARTIN, District Judge.

Plaintiff College Park Holdings, LLC ("CPH") filed suit against defendant Race-Trac Petroleum, Inc. ("RaceTrac"), alleging violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k, as well as various state statutes. CPH claims that a petroleum release at RaceTrac's gasoline service station (the "Service Station Property") contaminated CPH's adjacent property on which it operates a Radisson Hotel (the "Hotel Property"). The RCRA claim was tried to the court without a jury on October 22–23, 2002. Based upon the evidence and testimony at trial, as well as the submissions by the parties, the court hereby makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### The Parties

1. Plaintiff CPH is a limited liability company organized under the laws of the State of Ohio.

2. Defendant RaceTrac is a corporation organized under the laws of the State of Georgia.

3. RaceTrac filed a Third Party Complaint against Trico V Petroleum, Inc., Petroleum Realty II, LLC, Merchant Investment Group, Inc., and USRP (Hollis) LLC. These third party claims and counterclaims, as well as CPH's state law claims, will be adjudicated in a separate jury trial currently scheduled for December 2, 2002.

### The Service Station Property and the Hotel Property

4. Between 1978 and December 1998, RaceTrac owned and operated a gasoline service station at 5022 Old National Highway in College Park, Fulton County, Georgia. This gas station was formerly known and referred to as the "RaceTrac # 279" gas station.

5. Four underground storage tanks ("USTs"), with tank capacities of 12,000 gallons, were installed at the Service Station Property in 1980. Three USTs contain regular, midgrade, and premium unleaded gasoline. The fourth UST is a diesel UST which RaceTrac closed in place on July 1, 1998.

6. In December 1998, RaceTrac sold the Service Station Property to USRP (Hollis), LLC. Since that time, the property has been owned or operated as a gas station by one or more of the Third Party Defendants.

7. Surrounding the Service Station Property to the North and East is a 4.4–acre property located at 5010 Old National Highway which, since 1998, has been owned by CPH.

8. In 1981, a seven-story hotel was constructed on this property. Plaintiff CPH acquired title to the Hotel Property in 1998, as part of a defaulted loan workout agreement.

9. Currently, eight monitoring wells (MW–1 through MW–8) are present on the Service Station Property. An additional five monitoring wells are present on the Hotel Property (RMW–1 through RMW–5).

10. The Service Station and Hotel Properties are built upon fractured bedrock. This creates a unique hydrogeologic condition, causing unpredictability in groundwater flow. Rather than flowing evenly and steadily, such as occurs with a porous medium, groundwater in fractured bedrock flows in indetermi-

nate patterns through fractures in the rock.

### Discovery of Contamination at the Service Station and Hotel Properties

11. Releases and leakages of petroleum products at gas station facilities, impacting soil and groundwater, are common occurrences in Georgia. The extent and environmental impact of these releases are assessed by collecting and analyzing soil and groundwater samples for petroleum-related constituents, such as free product, BTEX (benzene, toluene, ethylbenzene, and xylenes), naphthalene and total polynuclear aromatic hydrocarbons.

12. Free product is free phase petroleum product that is not dissolved in groundwater. Free product is a concern because, as it dissolves, it is a persistent source of contamination for the groundwater. The Georgia Underground Storage Tank Rules ("GUST Rules") require free product to be removed if it is found in groundwater monitoring wells in thickness greater than one-eighth of an inch.

13. In early 1992, a "Phase I" environmental assessment was performed by LAW Associates, Inc. ("LAW," now known as "MacTec") at the Hotel Property. Because the USTs at the Service Station Property were located only ten feet from the Hotel Property, LAW was asked to perform a "Phase II" sampling investigation on the Hotel Property near the UST pit.

14. In March 1992, as part of its Phase II sampling investigation, LAW installed a monitoring well at the Hotel Property. The groundwater sample from this monitoring well was found to contain benzene, a known carcinogen present in petroleum, at a concentration "in excess of limits defined in the Safe Drinking Water Act."

15. In a letter dated October 25, 1993, RaceTrac notified the Georgia Department of Natural Resources, Environmental Protection Division ("EPD") that a release from its petroleum USTs had taken place.

16. In October 1994, LAW installed two additional groundwater monitoring wells on the Hotel Property which also revealed the presence of benzene and other petroleum contaminants in excess of applicable regulatory levels.

17. In March 1995, LAW prepared a Phase I Environmental Update for the Hotel Property by examining sites within a half-mile radius to determine the potential sources of contamination. LAW determined the likely source of the Hotel Property contamination was the RaceTrac Service Station. About September 30, 1996, counsel for CPH's predecessor-in-interest informed EPD of a suspected release from the Service Station Property.

18. By letter dated November 12, 1996, EPD notified RaceTrac that the agency had become aware of a suspected release of petroleum from an UST at the Service Station Property. EPD directed RaceTrac to investigate and confirm the suspected release in accordance with the GUST Rules and to report the results of this investigation to EPD by November 20, 1996.

19. After several extensions of time, RaceTrac submitted a Site Check Report in January 1997. The Site Check Report included sampling

results which indicated that the groundwater at the Service Station Property was contaminated with elevated levels of petroleum contaminants. Consequently, EPD directed RaceTrac to submit a Corrective Action Plan–Part A ("CAP Part A").

20. In May 1997, RaceTrac submitted its CAP Part A to EPD.

21. RaceTrac's CAP Part A groundwater sampling results showed that all three monitoring wells at the Service Station Property contained benzene concentrations exceeding EPA Drinking Water and Georgia In–Stream Water Quality Standards. At that time, no corrective action had been completed.

22. RaceTrac's CAP Part A noted that a CAP Part B was necessary because groundwater concentrations of benzene exceeded Georgia In–Stream Water Quality Standards. Under the GUST Rules, if dissolved groundwater contamination exceeds Georgia In–Stream Water Quality Standards, preparation of a CAP Part B is required.

23. By letter to EPD dated June 8, 1998, RaceTrac's consultant, Terraine, Inc., submitted a milestone schedule to EPD under which RaceTrac committed to submit a CAP Part B report to EPD by August 1998.

24. In March 1999, CPH engaged LAW to conduct an updated environmental assessment of the Hotel Property. As part of this assessment, LAW discovered approximately seven inches of free product in monitoring well RMW–2 at the Hotel Property, located directly east of and only a few feet away from the UST tank pit at the Service Station Property.

25. On April 28, 1999, CPH notified EPD of the free product and groundwater contamination detected at the Hotel Property.

26. On August 11, 1999, EPD notified RaceTrac that free product had been detected on the Hotel Property. EPD directed RaceTrac to investigate the contamination, immediately remove any free product, and submit its overdue CAP Part B. RaceTrac did not comply with these directives.

### Property Access Negotiations Between RaceTrac and CPH

27. Although instructed by the EPD to address the free product on the Hotel Property in August 1999, RaceTrac presented no direct[1] evidence of any request for access to the Hotel Property prior to a letter requesting access sent in January of 2000. Therefore, the court finds that RaceTrac did not request access to the Hotel Property until January 2000.

28. In response, CPH sent a proposed access agreement to RaceTrac in February 2000. However, RaceTrac would not accept this proposal because it required RaceTrac to assume full responsibility for remediating any contamination found on the property. Instead of negotiating for access at that time, RaceTrac did not respond to CPH's proposal.

---

1. RaceTrac's corporate representative at trial, Max McBrayer, testified that he thought he recalled that Chuck Olderman (Racetrac's corporate counsel) had told him that Mr. Olderman verbally sought access to the Hotel Property. However, Racetrac never presented Mr. Olderman at trial to testify regarding this fact.

29. On August 29, 2000, EPD issued to RaceTrac a formal Notice of Violation due to RaceTrac's failure to timely submit a CAP Part B.

30. On January 17, 2001, EPD issued a second Notice of Violation to RaceTrac due to RaceTrac's continuing failure to submit a CAP Part B, remove free product, and submit a free product recovery report.

31. Finally, in March 2001, RaceTrac resumed negotiations with CPH for access to the Hotel Property in order to carry out EPD's mandate.

32. During the next two months, RaceTrac negotiated with CPH to gain access to the Hotel Property. By April 27, 2001, RaceTrac and CPH had agreed upon all essential terms of an access agreement. CPH asked RaceTrac to sign the access agreement and return it to CPH.

33. On the same day, RaceTrac received a proposed consent order from EPD. Rather than consent to the terms of the proposed consent order RaceTrac responded that it would, among other things, terminate access negotiations with CPH. As a result, RaceTrac did not sign the finalized access agreement and return it to CPH, nor did RaceTrac inform CPH of the reason for its nonresponse.

34. On May 16, 2001, CPH's attorney inquired as to why he had not heard back from RaceTrac regarding the access agreement.

35. No response was forthcoming, and RaceTrac subsequently changed attorneys. In August 2001, negotiations regarding access resumed, and by August 30, 2001 an access agreement was reached. This agreement is still in place. RaceTrac began its investigation of the Hotel Property in September 2001.

36. During this time, RaceTrac never requested a formal access order from EPD, although RaceTrac was aware it could ask EPD for one.

### RaceTrac's CAP Part B Submission

37. Although originally due in August 1998, RaceTrac did not submit a proposed CAP Part B until August 15, 2001. RaceTrac's proposed CAP Part B did not make any reference to the free product detected at the Hotel Property. RaceTrac's proposed CAP Part B requested that EPD assign the site "no further action" status.

38. RaceTrac's CAP Part B relied on October 1998 sampling data. EPD found this data to be unusual because the dissolved contamination had decreased precipitously, and RaceTrac had not engaged in corrective action that would account for the sharp decline in contaminant concentrations. Accordingly, EPD found the October 1998 data to be anomalous.

39. Also, RaceTrac did not submit the favorable October 1998 data, showing a significant drop in contamination, until May 27, 1999. By waiting nearly seven months after the samples were taken, confirmation samples could not be drawn. RaceTrac did not explain the delay in the submission of this data.

40. EPD has issued several technical approval letters accepting certain RaceTrac submittals required as part of a CAP Part B; however, RaceTrac has never received final approval for a CAP Part B. EPD has issued various letters to RaceTrac indicating its CAP Part B is deficient and directing RaceTrac to delineate the dissolved contamina-

tion plume, propose investigations concerning the irrigation well, propose additional groundwater sampling and groundwater potentiometric surface measurements, propose vacuum enhanced fluid recovery, and submit a schedule for finalization of the CAP Part B.

41. The only corrective action taken by RaceTrac has been free product bailing and application of absorbent socks. Given the fractured bedrock nature of the site and the continued presence of free product, these techniques are insufficient for long-term remediation.

42. On September 16, 2002, EPD issued an Administrative Order to RaceTrac. The order directed RaceTrac to: (1) prepare a proper CAP Part B providing for the delineation of the dissolved and free product plumes, remediation of the free product found in RMW–2, and a fate and transport model for the fractured bedrock; (2) comply with public notification requirements; (3) submit the CAP Part B to EPD for review and approval within sixty days; and (4) following EPD approval, proceed with remediation activities.

43. RaceTrac filed a petition for hearing on the Administrative Order on September 30, 2002, which stays the order's effectiveness pending review by an administrative law judge.

### Free Product in MW–1 and the Possibility of a New Release

44. On August 21, 2002, free product was discovered in MW–1 on the Service Station Property. MW–1 is the monitoring well closest to the USTs. The level of free product in this well was measured at 3.5 inches on August 22, 2002 and at over 7 inches on September 25, 2002.

45. RaceTrac's expert, Dr. Shahrokh Rouhani, testified that finding such a substantial amount of free product in MW–1 nine years after Race-Trac's confirmed release indicates a new release occurred at the Service Station Property after RaceTrac sold the property in 1998.

46. CPH does not believe a new release occurred. Lisa Lewis from EPD and Mr. Steven Hart, CPH's expert, testified that it is not uncommon for old free product to appear in monitoring wells that previously only contained dissolved contamination. Such appearances occur as a result of changes in groundwater levels in fractured bedrock hydrogeologic conditions.

47. RaceTrac provided no evidence, other than Dr. Rouhani's testimony, to suggest a new release occurred. Further, Dr. Rouhani was unable to estimate when another release occurred or the total number of releases. Importantly, the EPD compliance file indicates that the Service Station Property owners and operators after December 1998 have not been cited for violations of the GUST Act or Rules.

48. Dr. Rouhani's testimony is suspect because he generates graphs depicting the concentration of contaminants and groundwater at various monitoring wells over a five year period based on a very limited number of data points.

49. Moreover, the court finds it compelling that RaceTrac did not present any witnesses from its own environmental consultant, Terraine,

Inc., at trial. Instead, RaceTrac presented an expert witness who was not involved with any sampling, investigation, or remediation at the site. In contrast, CPH presented an expert employed by CPH's environmental consultant, which CPH has used since the first investigation of conditions on the Hotel Property.

50. Also adding credibility to CPH's argument that there has been no new release since RaceTrac sold the property is the appearance of diesel fuel contaminants, known as polynuclear aromatic hydrocarbons, on the Service Station Property. The only confirmed source of diesel fuel on the Service Station Property is RaceTrac's UST containing diesel; however, this UST has been closed since 1998. Accordingly, it appears that the fractured bedrock upon which the Service Station Property sits can trap contaminants for a significant period of time before their appearance in any particular monitoring well. Changes in groundwater levels flowing through the fractured bedrock cause these contaminants to appear in the monitoring wells, even after periods of low levels of contamination.

51. Free product in the environment degrades over time and becomes darker in color, thus appearing weathered. A weathered appearance is indicative of free product that has been present in the environment for a long time, rather than a new release. The free product found in MW–1 on August 22, 2002 and September 25, 2002 had a weathered appearance.

52. Based on all of the evidence and testimony presented by the parties on the possibility of a new release, the court finds that the evidence does not support RaceTrac's theory that a new release occurred after RaceTrac sold the property. Thus, the court finds that the free product discovered in MW–1 in August and September of 2002 is not the result of a new release, but the result of RaceTrac's confirmed 1993 release.

### The Irrigation Well

53. An irrigation well was installed at the Hotel Property in 1993. It is used to supply water for landscaping. CPH's practice is to operate the well in the mornings from April until October each year.

54. The irrigation well has been inoperable at various times, but was used from 1999 until April 2001, when it stopped working as a result of electrical and mechanical problems. CPH had the irrigation system and well pump repaired in February 2002, and the well is currently in use.

55. RaceTrac believes that CPH has used and repaired the irrigation well in order to gain a litigation advantage. This is because the irrigation well is a receptor, which must be taken into account by RaceTrac in any site remediation plan.

56. The court finds that there is insufficient evidence to conclude that CPH repaired the irrigation well for litigation advantage. Even if the irrigation well were not present at the Hotel Property, RaceTrac would still be in violation of the GUST Rules.

## CONCLUSIONS OF LAW

### Evidentiary Issues

On the eve of trial, CPH submitted two motions in limine [Doc. Nos. 87–1, 89–1, & 92–1]. The first asks the court to exclude, as an offer of compromise, a letter regarding the irrigation well. The second asks the court to exclude the testimony of Race-Trac's expert, Dr. Shahrokh Rouhani. Before addressing the merits of CPH's RCRA citizen suit claim, the court considers these motions.

Pursuant to Federal Rule of Evidence 408, CPH asks the court to exclude Defendant's Exhibit 244,[2] one in a series of letters delineated as confidential offers of compromise. In exhibit 244, RaceTrac offers to pay CPH for the cost of closing CPH's irrigation well and using city water in perpetuity. RaceTrac offered to do so in exchange for CPH's recording a restriction on the Hotel Property prohibiting the use of any irrigation well. At trial, Race-Trac presented this evidence in an attempt to prove that CPH was being unreasonable in its operation of the irrigation well. Specifically, RaceTrac offered the letter to prove "the truth of the facts contained in [it], the appropriateness of injunctive relief, and the propriety of granting attorney's fees to Plaintiff."

Federal Rule of Evidence 408 provides that:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct criminal investigation or prosecution.

Fed.R.Evid. 408. The Advisory Committee's Note explains that the main basis for this rule is the "promotion of the public policy favoring the compromise and settlement of disputes." Following this rationale, the Eleventh Circuit has held that "[t]he test for whether statements fall under this rule is 'whether the statements or conduct were intended to be a part of the negotiations toward compromise.'" *Blu-J, Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 642 (11th Cir.1990) (quoting *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir.1981)).

■ Here, the series of letters exchanged between RaceTrac and CPH, including defense exhibit 244, "were intended to be a part of the negotiations toward compromise." *Blu-J, Inc.*, 916 F.2d at 642. The exchange began on May 21, 2002 in a letter from RaceTrac clearly marked as a "Settlement Communication." Each of CPH's responses was marked "Confidential Offer of Compromise—Inadmissible Under F.R.E. 408." RaceTrac attempts to avoid the consequences of these designations by arguing about the purpose of introducing the letters. Despite claims to the contrary, RaceTrac offered Defendant's Exhibit 244 in order to show the "invalidity of [CPH's] claim." Fed.R.Evid. 408. By demonstrating that CPH rejected RaceTrac's offer to pay for city water,

---

2. CPH's motion actually asks the court to exclude Defendant's Exhibits 231, 234, 235, 238, and 244. However, RaceTrac only tendered exhibit number 244 at trial.

RaceTrac is attempting to persuade the court that CPH opened the irrigation well only to gain an advantage in litigation. As such, RaceTrac wants to invalidate CPH's claim that RaceTrac's CAP Part B must address the irrigation well. Accordingly, RaceTrac's attempt to introduce Defendant's Exhibit 244 violates Federal Rule of Evidence 408. *See Ramada Dev. Co.*, 644 F.2d at 1107 (affirming trial court's refusal to permit the introduction of an architect's report prepared to facilitate settlement negotiations). Therefore, CPH's motion in limine [Doc. No. 89–2] to exclude Defendant's Exhibit 244 is GRANTED, and the court will not consider this letter in reaching its conclusions of law.

As its second motion in limine, CPH has moved to exclude the expert testimony of Dr. Shahrokh Rouhani. CPH submits this motion on the ground that Dr. Rouhani's expert testimony fails to meet the standards for relevancy and reliability required by Federal Rule of Evidence 702 and the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). RaceTrac first responds by arguing that CPH's *Daubert* motion is untimely, and thus, should be denied by the court. RaceTrac goes on to assert that Dr. Rouhani's testimony is admissible because it is both relevant and reliable.

> Federal Rule of Evidence 702 provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert .. may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In interpreting the requirements of Rule 702, the Supreme Court in *Daubert* established that scientific expert testimony must be both relevant and reliable to be admissible. 509 U.S. at 594–95, 113 S.Ct. 2786. Accordingly, trial courts are to act as "gatekeepers" and examine an expert's proposed testimony to ensure it meets both requirements. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ Likewise, the Eleventh Circuit has held that expert testimony is admissible only "if (1) the expert is qualified to testify competently; (2) the expert has used sufficiently reliable methodology in reaching a conclusion; and (3) the testimony will assist the trier of fact." *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir.2000); *accord Maiz v. Virani*, 253 F.3d 641 (11th Cir.2001). Moreover, the burden of establishing the standards for admissibility rests with the proffering party. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2002). Accordingly, RaceTrac bears the burden of establishing the admissibility of Dr. Rouhani's testimony. *Id.*

■ As its first challenge, CPH asserts that Dr. Rouhani's testimony is not relevant to the ultimate resolution of this case. However, a straightforward application of Rule 702 demonstrates that Dr. Rouhani's testimony is relevant. Rule 702 requires expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." Although CPH asserts that there is only one issue in this case—RaceTrac's ongoing violations of the GUST Rules—this ultimate issue involves a host of predicate legal and factual issues. These predicate issues, including whether RaceTrac adequately investigated the off site impact of its 1993 release, whether

RaceTrac used appropriate investigation and removal techniques, and whether subsequent releases occurred after the sale of the property, are addressed by Dr. Rouhani's testimony.

Principally, Dr. Rouhani testified about the possibility of a new release after Race-Trac sold the property. Contrary to CPH's assertion of irrelevance, the presence or absence of subsequent releases directly impacts upon whether RaceTrac was ever, in fact, in violation of any applicable RCRA requirements and to what extent injunctive relief may be appropriate in this case. Although Dr. Rouhani may not have the legal expertise to say whether or not RaceTrac is in violation of the GUST Rules, he is capable of testifying about scientific facts that allow the court to make the legal determination. Resolution of each of these factual and legal issues is important to the outcome of the case, and therefore, Dr. Rouhani's testimony is relevant under Rule 702.

After determining that Dr. Rouhani's testimony is relevant, the court must decide if his testimony is sufficiently reliable to be admitted into evidence. *See Kumho Tire Co.*, 526 U.S. at 148–150, 119 S.Ct. 1167. Although the court does not ultimately subscribe to the expert opinion proffered by Dr. Rouhani, the court cannot conclude that his testimony is unreliable and inadmissible. Dr. Rouhani testified that the observed rise in groundwater BTEX concentrations after 1998, and the appearance of free product for the first time in August 2002 in a well immediately adjacent to the UST pit, are indicative of a new, recent petroleum release. Contrary to CPH's assertions, Dr. Rouhani's conclusions are not "baseless speculation." These conclusions are based on all available groundwater monitoring data from the Service Station and Hotel Properties. *See Maiz*, 253 F.3d at 665–66 (admitting expert testimony over objection that the

testimony was unreliable). This data is adequate support for Dr. Rouhani's testimony and scientific conclusions regarding a new release.

Moreover, although CPH argues that Dr. Rouhani misapplies published decay rates to speculate about subsequent new releases, Dr. Rouhani uses the controversial rates only as a check on the observed decreases in groundwater contamination seen at the Service Station and Hotel Properties. As he has stated, Dr. Rouhani relied upon the published decay rates to determine whether the observed decreases in groundwater BTEX concentrations by October 1998 fell within the range of observed decay rates of petroleum constituents in groundwater as published in a nationwide survey of degradation of organic chemicals in groundwater. In contrast to CPH's assertion, he does not use these numbers to determine if there has been a new release. Thus, although the court is persuaded by CPH's expert, rather than Dr. Rouhani, the court cannot say that his testimony is unreliable such that it should be excluded from evidence. The parties relied on the same data and, not unsurprisingly, simply reached different conclusions.

Therefore, the court finds that Dr. Rouhani's expert opinion satisfies the standard for admissibility in Federal Rule of Evidence 702. As such, CPH's motion in limine to exclude Dr. Rouhani's testimony is hereby DENIED [Doc. Nos. 87–1 & 92–1].

### Merits of RCRA Citizen Suit Claim

In 1976, Congress enacted RCRA "to promote the protection of health and the environment" and to eliminate "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." 42 U.S.C. § 6902(a); H.R.Rep. No. 94–1491, at 4 (1976), *reprinted in* 1976

U.S.C.C.A.N. 6238, 6241. In 1984, Congress amended RCRA to include Subtitle I, which required the United States Environmental Protection Agency ("EPA") to develop regulations establishing a program for USTs. 42 U.S.C. §§ 6991–6991i. EPA's release response and corrective action requirements for petroleum-containing USTs were promulgated on September 23, 1988 and took effect on December 22, 1988. 53 Fed.Reg. 37082 (Sept. 23, 1988) (codified at 40 C.F.R. Part 280).

RCRA authorizes a state UST program to operate in lieu of the federal program, if the state program has received formal approval from the EPA. 42 U.S.C. § 6991c(d)(2). To gain this approval, Georgia developed a UST program consisting of the Georgia Underground Storage Tank Act and the GUST Rules. Ga.Code Ann. §§ 12–13–1, 12–13–22 (2001); Ga. Comp. R. & Regs. Ch. 391–3–15 (2001). Effective March 4, 1996, EPA announced its approval of Georgia's UST program and delegated authority to Georgia EPD to administer the GUST Rules in lieu of the federal program under RCRA. 61 Fed. Reg. 4224 (Feb. 5, 1996) (codified at 40 C.F.R. § 282.60). Consequently, the GUST Rules are enforceable by a RCRA citizen suit.

■ Section 6972(a)(1) of RCRA provides for individual citizen suits against violators who do not comply with mandated regulations and agency orders. 42 U.S.C. § 6972(a)(1). The statute provides that "any person may commence a civil action on his own behalf—(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." *Id.* at § 6972(a)(1)(A). The purpose of the citizen suit provision is to authorize persons directly injured by an environmental violation to act as private attorneys general and enforce RCRA's re-

quirements. *See Briggs & Stratton Corp. v. Concrete Sales & Serv., Inc.,* 20 F.Supp.2d 1356, 1374 (M.D.Ga.1998). CPH is a person entitled to commence a civil action on its own behalf against Race-Trac under section 6972(a)(1)(A). 42 U.S.C. § 6903(15).

■ In order to prevail on its citizen suit claim under section 6972(a)(1)(A), CPH must first show that RaceTrac was in violation of UST corrective action requirements as of the date its RCRA claim was commenced. In other words, the violations must not be wholly in the past. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 57–58, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Instead, RaceTrac's RCRA violations must be ongoing at the commencement of the lawsuit. *Id.* at 64–65, 108 S.Ct. 376; *see also Atlantic States Legal Found. v. Tyson Foods,* 897 F.2d 1128, 1134–35 (11th Cir. 1990).

■ CPH added its RCRA citizen suit claim when it filed its Amended Complaint on June 7, 2001. At the time CPH filed its Amended Complaint, EPD had already issued two notices of violation to RaceTrac directing the company to investigate, delineate, and remediate the contamination from its confirmed 1993 UST release and to undertake the recovery of free product at CPH's adjacent Hotel Property. Race-Trac failed to do so, and therefore, Race-Trac was in violation of corrective action requirements as of June 7, 2001. Even after the filing of the complaint in this action, EPD issued notices of violation to RaceTrac. However, RaceTrac has not complied with these directives. Most recently, EPD issued an Administrative Order demonstrating that RaceTrac's violations of the GUST Rules are ongoing. In the September 16, 2002 order, the EPD notes that RaceTrac's continuing actions

"constitute violations of the GUST Rules and GUST Act."

As its first violation of the GUST Rules, RaceTrac has failed to investigate off site impacts at the Hotel· Property caused by RaceTrac's 1993 UST release. RaceTrac has not properly investigated or delineated the impacts from its release and the extent of contamination at the Service Station and Hotel Properties. For example, RaceTrac needs to install additional monitoring wells to delineate the extent of the contaminant ·plumes. Therefore, RaceTrac is in violation of GUST Rule 391–3–15–.08 and 40 C.F.R. § 280.51.

Second, RaceTrac has failed to investigate and remove the free product and groundwater contamination at the Hotel Property in violation of GUST Rule 391–3–15–.09(1), which incorporates 40 C.F.R. Part 280, Subpart F by reference. Specifically, RaceTrac is in violation of 40 C.F.R. § 280.62(a)(6) which requires investigation "to determine the presence of free product" and "free product removal as soon as practicable." Also, RaceTrac is in violation of 40 C.F.R. § 280.64(a) which requires removal of free product "by using recovery and disposal techniques appropriate to the hydrogeologic conditions at the site." RaceTrac's passive bailing of free product and installation of an absorbent sock in RMW–2 are insufficient remediation strategies based on "the hydrogeologic conditions at the site." As such, these techniques are not acceptable long-term solutions.

Third, RaceTrac is in violation of GUST Rule 391–3–15–.09(4)(b) and (c), requiring RaceTrac to "[r]emediate free product" and "[r]emediate groundwater contamination." Since April 2002, EPD has directed RaceTrac to commence active remediation to remove free product, such as vacuum enhanced fluid recovery measures, which RaceTrac has failed to do. Accordingly, the court finds that RaceTrac is in viola-

tion of GUST Rule 391–3–15–.09(4) for failing to remediate the free product and groundwater contamination that migrated onto the Hotel Property from RaceTrac's UST release.

Fourth, RaceTrac is in violation of GUST Rule 391–3–15–.09(2) which requires the submittal of a proper CAP Part B. RaceTrac was required to submit a CAP ·Part B to EPD in August 1998, but RaceTrac did not submit a full CAP Part B until August 15, 2001, after the filing of CPH's RCRA citizen suit claim. Also, EPD has made clear that RaceTrac's CAP Part B submittals do not meet mandatory regulatory requirements. As a result, RaceTrac is still in violation of GUST Rule 391–3–15–.09(2) and 40 C.F.R. § 280.66.

■ RaceTrac asserts that any noncompliance with RCRA and the applicable GUST Rules stems from CPH's refusal to allow RaceTrac access to the Hotel Property in order to carry out EPD directives. As such, RaceTrac believes it cannot be held responsible for GUST Rule violations caused by CPH's access denial. However, as noted in the court's findings of fact, the court is not convinced that RaceTrac was denied access to the Hotel Property. Thus, the court rejects RaceTrac's access denial defense.

■ Moreover, RaceTrac argues that any GUST Rule violation for failure to submit a CAP Part B was cured when RaceTrac's CAP Part B submittals were "approved" by the EPD. Accordingly, RaceTrac believes CPH's claim is moot and should be dismissed. Despite Race-Trac's assertions, the weight of the evidence demonstrates that EPD's letters to RaceTrac supposedly approving its CAP Part B were only technical approvals. These served as approvals for parts of the CAP Part B, but a complete CAP Part B has never been submitted or approved.

1348

Therefore, the court also rejects Race-Trac's mootness defense.

■ In one of two motions for directed verdict made at trial, RaceTrac asserts that the CAP Part B requirement did not attach prior to its sale of the Service Station Property in 1998. RaceTrac claims that a change in the GUST Rules defining when a CAP Part B was required prevented it from having to develop a CAP Part B based on the conditions at the Service Station and Hotel Property prior to the sale of the property in 1998. According to RaceTrac, only in 1999, when free product was discovered on the Hotel Property, did a CAP Part B become necessary. Since it no longer owned the property at the time it believes the CAP Part B requirement attached, RaceTrac asserts that it is not in violation of the GUST Rules.

Again, the court finds that the overwhelming weight of the evidence demonstrates that RaceTrac is in violation of the CAP Part B requirement. CAP Part B requirements under the GUST Rules are triggered if groundwater contamination is found to exceed Georgia in-stream water quality standards. Ga. Comp. R. & Regs. R. 391–3–15–.09(3)(b). The CAP Part A submitted by RaceTrac to EPD in May 1997 specifically notes that "groundwater benzene levels within site monitoring wells exceed the Georgia in-stream water quality standards," and therefore, a CAP Part B is "necessary." This groundwater contamination immediately triggered Race-Trac's legal obligation to submit a CAP Part B. As a result, EPD required Race-Trac to submit a CAP Part B by August 1998, while RaceTrac still owned the Service Station Property. Despite RaceTrac's protestations to the contrary, RaceTrac has never fully complied with these requirements. Therefore, RaceTrac's motion for a directed verdict regarding the CAP Part B violations is DENIED.

Hence, despite numerous directives and notices of violation issued by EPD, Race-Trac has refused to fulfill its legal obligations to investigate, delineate, and remediate the free product and groundwater contamination at the Service Station and Hotel Properties. RaceTrac has had many chances to attain compliance with the GUST Rules, but has failed to do so. The court finds that RaceTrac's violations of the GUST Rules and federal regulations incorporated therein by reference, remain ongoing to this day. Because of these continuing violations, CPH is entitled to relief under RCRA.

### REMEDIES

■ Section 6972(a) provides that "[t]he court shall have jurisdiction ... to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A) ...." 42 U.S.C. § 6972(a). The regulations "referred to in paragraph (1)(A)" include RCRA's provisions governing USTs, such as the federally-approved GUST Act and GUST Rules. As the court has concluded that RaceTrac is in violation of various GUST Rules, section 6972(a) explicitly entitles the court to enforce these rules through injunctive relief. *See, e.g., Mondry v. Speedway Superamerica LLC*, No. 96 C 2159, 1999 WL 1072623, 1999 U.S. Dist. LEXIS 9095 (N.D.Ill. May 12, 1999) (granting injunctive relief for UST regulation violations and requiring defendant to prepare a definitive corrective action plan and to remediate the contamination of plaintiff's property).

■ In addition to injunctive relief, CPH also requests that the court levy civil penalties against RaceTrac. As its second motion for a directed verdict, RaceTrac counters that such civil penalties cannot be levied in a RCRA citizen suit. Section 6972(a) provides that a district court has

jurisdiction in a citizen suit "to apply any appropriate civil penalties under section 6928(a) and (g) of this title." 42 U.S.C. § 6972(a). However, the civil penalties in sections 6928(a) and (g) apply only to violations of RCRA Subchapter III, the provisions governing "cradle-to-grave" management of hazardous waste. In this case, CPH filed suit alleging violations of RCRA Subchapter IX, the provisions governing USTs.

Importantly, Subchapter III is distinct from Subchapter IX. As a self-contained Subchapter of RCRA, Subchapter IX has its own set of enforcement provisions, including the ability to assess civil penalties under certain circumstances. 42 U.S.C. § 6991e(d). But, the citizen suit provision in 6972(a) only authorizes a district court to apply civil penalties under Subchapter III, not Subchapter IX. The plain language of the statute does not authorize this court to award civil penalties under section 6991e(d)(2) in a citizen suit, as CPH requests. *See, e.g., Dydio v. Hesston Corp.,* 887 F.Supp. 1037, 1039 n. 2 (N.D.Ill.1995). Therefore, the court GRANTS RaceTrac's motion for a directed verdict on the issue of civil penalties. The court will not assess civil penalties against RaceTrac.

■ Finally, RCRA section 6972(e) provides that "[t]he court, in issuing any final order in any action brought pursuant to this section ..., may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, where the court determines such an award is appropriate." 42 U.S.C. § 6972(e). Because CPH has "succeed[ed] on [a] significant issue in litigation" by showing that RaceTrac is in violation of various GUST Rules, CPH is the prevailing party for purposes of section 6972(e). *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In addition to being the prevailing party, CPH has dem-

onstrated a continuing course of misbehavior on the part of RaceTrac. As such, the defendant has repeatedly ignored EPD directives, forcing CPH to file this lawsuit. *See, e.g., Mondry,* 1999 WL 1072623, 1999 U.S. Dist LEXIS, at *6–7. Accordingly, CPH is entitled to an award of litigation costs under section 6972(e).

### *Permanent Injunction*

Having found that CPH is entitled to injunctive relief, the court hereby OR-DERS that RaceTrac shall, **within thirty (30) days of the entry of this order:**

1. Fully and properly investigate all off site impacts from its UST release at the Hotel Property in accordance with GUST Rule 391-3-15-.08 and 40 C.F.R. § 280.51;

2. In accordance with GUST Rule 391-3-15-.09 and 40 C.F.R. Part 280, Subpart F:

  (a) Fully and properly investigate to determine the presence of free product, and commence free product removal;

  (b) Remove all free product from its UST release, including at the Hotel Property, to the maximum extent practicable in a manner that minimizes the spread of contamination by using recovery and disposal techniques appropriate to the hydrogeologic conditions at the site;

  (c) Prepare and submit to both EPD and CPH a "free product removal report" containing the information specified in these regulations; and

  (d) Fully and properly investigate its UST release on the Service Station Property and the surrounding area to determine the full extent and location of contaminated soils and groundwater.

3. Prepare and submit to EPD and CPH a complete, proper, and approvable CAP Part B in accordance with GUST Rule 391–3–15–.09(2). Such CAP Part B shall comport in all respects with EPD requirements, including fully delineating the free product plume and plotting it on site maps;

4. Fully and properly delineate the extent of groundwater contamination in accordance with GUST Rule 391–3–15–.09(4);

5. Timely and fully comply with all further directives or orders which may be issued to RaceTrac by EPD relating to the UST release from the Service Station Property;

6. Submit a written report to EPD and CPH detailing the findings of all investigations relating to its UST release required herein, which includes copies of all data and analytical reports generated during such investigations;

7. Upon EPD's approval of the CAP Part B required to be submitted herein, RaceTrac shall:

(a) Implement the approved CAP Part B as quickly as possible, and in accordance with any schedule approved or requested by EPD;

(b) Undertake all further actions necessary or requested by EPD in order to obtain "no further action" status for the 1993 UST release and the Hotel Property.

This permanent injunction will remain in effect until fully discharged by RaceTrac or further order of this court. CPH will allow RaceTrac all reasonable access to the Hotel Property so that RaceTrac may fulfill its obligations effectively and efficiently.

### Litigation Costs

Having found CPH is entitled to an award of litigation costs, the court DIRECTS CPH to submit detailed documentation regarding these costs within fifteen (15) days of the issuance of this order. The court refers counsel for CPH to Local Rules 54.1 and 54.2, as well as the Eleventh Circuit opinions in *Norman v. Montgomery Housing Authority*, 836 F.2d 1292 (11th Cir.1988) and *American Civil Liberties Union v. Barnes*, 168 F.3d 423 (11th Cir.1999).

### Mediation

The court hereby ORDERS all parties in this case to participate in nonbinding mediation. The court refers this case to Randy Mayer as mediator.[3] However, the imposition of the injunction set forth herein shall not be stayed pending mediation of the remaining issues in this case. Neither will the court relieve the parties of the December 2, 2002 trial date at this time.

The parties are ORDERED to provide proposed date alternatives to the mediator within seven (7) days of the entry of this order to facilitate scheduling the mediation conference. Each party must bring to the mediation an individual with full authority to settle.[4] This means that each party must bring to the mediation an individual with authority to bind their client to a settlement for the full amount of the demand and any necessary action, provided, of course, that the negotiations persuade the negotiator that full settlement is appropriate. This expedites negotiations by

---

**3.** Mr. Mayer is with Resolution Resources, 1360 Peachtree Street, Suite 1100, Atlanta, GA 30309; phone number 404–215–9800.

**4.** That individual might be the party, an officer of the party, an insurance representative, or the lawyer herself. Of course, the party, or a party representative, should always be present.

avoiding the need to get back to the client for more authority, which inevitably delays the process and which is viewed by some as an attempt to manipulate the process.

Unless they otherwise agree, the parties are to share the cost of mediation equally. *See* Local Rule 16.7(N). The parties retain the right to a full trial if there is no settlement.

### Summary

The remaining claims asserted by CPH and the Third Party Defendants in this action are unaffected by this order and will be adjudicated by a jury beginning on December 2, 2002. Finally, CPH's motion in limine [Doc. No. 89–1] is hereby GRANTED, and CPH's motions in limine [Doc. Nos. 87–1 & 92–1] are hereby DENIED.